File Name: 07a0123n.06

Filed: February 15, 2007NOT RECOMMENDE
D FOR PUBLICATION

No. 05-4119

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOSE MIGUEL MATEO, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF AN |
| | ) | ORDER OF THE BOARD OF |
| ALBERTO GONZALES, Attorney General | ) | IMMIGRATION APPEALS |
| of the United States of America, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

**Before: KEITH, CLAY, Circuit Judges; and MAYS, District Judge.[*]**

**SAMUEL H. MAYS, JR., District Judge.** Jose Miguel Mateo, a native of Guatemala,

seeks review of the denial by the Board of Immigration Appeals ("BIA") of his petition for asylum,

voluntary withholding of removal, and cancellation of removal. On August 8, 2005, the BIA

affirmed the Immigration Judge's ("IJ") denial of Mateo's request for relief. Mateo timely petitioned

for review. For the reasons set forth below, we **DENY** Mateo's petition.

**I. BACKGROUND**

Mateo is a 39-year-old native of Guatemala. He entered the United States illegally on or

---

[*] The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of
Tennessee, sitting by designation.

about December 14, 1990. He was born and raised in the municipality of San Sebastian Coatan, in the Guatemalan department of Huehuetenango, received very little education, and worked as a farm laborer in Guatemala. In 1989, rebel guerrillas approached Mateo, demanded that he participate in a rebellion and threatened to kill him after he refused. Mateo testified at his evidentiary hearing that the guerrillas wanted him to kill and rob innocent people, that he did not want to kill and rob, and that he told them that he would not join them. After telling the guerrillas that he "didn't want to have those problems . . . they did," the rebels told him that because "you don't like what we do . . . we are going to kill you, because you don't want to do what we do." (J.A. at 31.) Mateo testified that he believed the guerrillas when they told him they would kill him because they came to his house, threatened him with death, and consequently forced him to flee his home.

Mateo fled to Mexico and remained there for a year before entering the United States. His wife, Appolonia Martin Juan, who also appears to have fled to Mexico, joined him in the United States in 1993. Their three children, who were born in Guatemala, remained there with their maternal grandfather. Mateo sends $300 a month to support them. Mateo and his wife have two additional children, Isabella, born in 1995, and Angelina, born in 1997, who are American citizens by birthright. Both are in good health and doing well in school. Mateo and his family reside in Cookeville, Tennessee, where he rents an apartment and works at the Perdue Chicken Factory. His wife does not work.

On October 1, 1991, Mateo timely submitted an application for asylum. In it, he indicated

that he speaks Spanish and Canjobal,[1] and he listed five children, only one of whom (Angelina) lived in the United States. Mateo described himself as a "farm laborer living in [a] small town," and expressed fear of being killed by government soldiers for being associated with guerrillas or by guerrillas for perceived cooperation with government soldiers. (J.A. at 179.)

On April 9, 2003, Mateo was charged as subject to removal from the United States pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), § 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA") on the ground that he was an alien present in the United States without having been admitted or paroled. On January 8, 2004, Mateo appeared with counsel before the IJ at an evidentiary hearing. The IJ denied Mateo's application for asylum, withholding of removal, and cancellation of removal.

The IJ questioned Mateo about his earnings and about copies of federal tax forms submitted into evidence. Mateo testified that his earnings varied from year to year and that he was paid by cash or check. As part of his request for cancellation of removal, Mateo stated that he had worked continuously since arriving in the United States in 1999, often as a farm hand. He also testified that he did not know whether his employer withheld taxes from his pay and that he paid someone each year to prepare his tax returns. The IJ then noted that only one side of each tax return had been submitted. Mateo responded that he had submitted what the tax preparer had given him.

Mateo stated that there were no jobs in Guatemala, and the IJ acknowledged that "[n]obody works in Guatemala[.]" (J.A. at 49.) Mateo testified that if he were deported he would take his

_____

[1]   The parties' briefs and the IJ's decision refer to the indigenous language spoken by Mateo and his family as "Chu." In his I-589 application, however, Mateo stated that he speaks Spanish and "Canjobal" (also known as Q'anjobal and Kanjobal). Both Chu (also known as Chuj) and Canjobal are dialects of Mayan indigenous language, spoken by a Guatemalan minority, all of whom are indigenous Mayans. *Languages of Guatemala, in* THE ETHNOLOGUE: LANGUAGES OF THE WORLD (Raymond G. Gordon, Jr. ed., 15th ed. 2005), *available at* http://www.ethnologue.com/show_country.asp?name=GT.

American daughters with him, but that he could also leave his daughters in the United States with a brother-in-law. He stated that he was not in touch with his family in Guatemala and that he had not spoken with them since the preceding year. Mateo testified that his daughters were able to speak Spanish and English, but that they were most proficient in Chu, the indigenous Mayan language.

During the hearing, Mateo's attorney pointed out twice that he had three witnesses ready to testify about Mateo's moral character. Those witnesses would have testified that they had worked with Mateo for many years, that they considered him to be trustworthy, a good person, and a friend, and that they could be more specific if required. At first, the IJ stated that he would take an offer of proof from the witnesses after qualifying Mateo for voluntary departure. Later in the hearing, the IJ concluded that the witnesses' testimony would go more "to discretion than good moral character," declining to hear them at all. (J.A. at 73.) The IJ determined that the real issue in the case was hardship. He stated that he would consider the Country Reports admitted into evidence in deciding Mateo's eligibility for cancellation of removal.

In his oral decision, issued on January 8, 2004, the IJ applied *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), and found that Mateo was not eligible for asylum because he had presented no testimony or evidence about any political opinion or other protected ground on account of which he had been persecuted. The IJ also concluded that Mateo did not have a well-founded fear of future persecution because the civil war in Guatemala had ended. Therefore, his fear of future persecution was not objectively reasonable. Because Mateo had failed to demonstrate a well-founded fear of persecution, the IJ concluded that Mateo had also failed to show it was more likely than not that he would be persecuted if returned to Guatemala, thus failing to meet the standard for withholding of removal.

-4-

The IJ noted that Mateo was not eligible for cancellation of removal. Although he had been continuously present in the United States for at least ten years and had not been convicted of any of the enumerated offenses, he had failed to demonstrate that his removal would result in an extremely unusual hardship for his children who were U.S. citizens. In assessing hardship, the IJ noted that extremely unusual hardship must be more than merely a lower standard of living or of education and that Mateo's American daughters were in good health, spoke Chu and Spanish, and had uncles, aunts, siblings, and a grandfather in Guatemala to help them assimilate. In assessing moral character, the IJ noted that the petitioner must present tax returns that have been filed regularly during the preceding ten years, but that the returns Mateo submitted were not convincing. The filing years on the forms had been crossed out and some information was missing. The court concluded that Mateo was not of good moral character because it was not clear that the tax returns had been filed.

Mateo timely appealed the immigration court's decision to the BIA. In his notice of appeal, Mateo stated that, the "Immigration Judge erred . . . by finding that there was no nexus between his testimony and a protected asylum ground, such as political opinion." (J.A. at 9.) Mateo further stated that "the reason [he] feared being persecuted by the rebels was [because he] told them he didn't want to participate in their fight. The rebels knew he did not agree with their goals because he told them so upon being solicited by the rebels." (*Id.*) Mateo also noted that, in finding him ineligible for cancellation of removal, the "Judge erred in finding that the hardship suffered by the two USC [sic] children did not meet the high standard required to allow the Judge to grant cancellation. When evaluated n [sic] the totality, . . . the Judge should have granted cancellation as a matter of discretion." (*Id.*)

On August 8, 2005, the BIA adopted and affirmed the IJ's decision, agreeing that Mateo's evidence was not sufficient to establish eligibility for any form of relief and affirming the IJ's order that Mateo be permitted to depart voluntarily. The BIA also noted that Mateo had raised new contentions on appeal inconsistent with his prior testimony, that there was no evidence to support those claims, and that the BIA does not normally consider arguments that have not been raised in the evidentiary hearing.

## II. ANALYSIS

### A. Standard of Review

Where, as here, the BIA expressly adopts and affirms the IJ's decision, it is the IJ's decision that is the relevant focus of review, unless the BIA has added to that decision. *See Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003). Because the BIA summarily adopted the IJ's decision without issuing its own opinion, we review the decision of the IJ as the final administrative order. *Hasan v. Aschcroft*, 397 F.3d 417, 419 (6th Cir. 2005). Questions of law are reviewed *de novo*. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). The "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The IJ's factual findings as well as the determination that the petitioner failed to establish eligibility for relief will be affirmed if substantial evidence supports those determinations. *Elias-Zacarias*, 502 U.S. at 481; *Mullai v. Ashcroft*, 385 F.3d 635, 638 (6th Cir. 2004). Under the substantial-evidence test, an immigration judge's decision must be "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001) (quoting *Elias-Zacarias*, 502 U.S. at 481). Evidentiary decisions are

reviewed "'only to determine whether such rulings have resulted in a violation of due process.'" *Hassan v. Gonzalez*, 403 F.3d 429, 435 (6th Cir. 2005) (quoting *Singh v. Ashcroft*, 398 F.2d 396, 407 (6th Cir. 2005)). Where discretionary, as in the petition for asylum, the BIA's decision about whether an applicant is eligible for admission to the United States is "conclusive unless manifestly contrary to law[.]" 8 U.S.C. § 1252(b)(4)(c). Under this deferential standard, we will not reverse a factual determination of the IJ unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original).

**B.    Discussion**

Section 208(b)(1) of the INA empowers the Attorney General, in his discretion, to grant asylum to refugees. 8 U.S.C. § 1158(b)(1)(A). A "refugee" is defined by the INA as an alien who is unable or unwilling to return to his home country due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). The alien bears the burden of establishing eligibility for asylum based on past persecution on account of a protected ground or a well-founded fear of future persecution on account of a protected ground. 8 C.F.R. § 208.13(a). If the alien's testimony is found to be credible, it may be sufficient to sustain a finding of persecution without any independent corroboration. *Id.* To establish a well-founded fear of future persecution, an applicant must show that:

> (1) he or she has a fear of persecution in his or her country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he or she were to return to that country; and (3) he or she is unable or unwilling to return to that

country because of such fear.

*Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). The well-founded fear of future persecution must be both subjectively genuine and objectively reasonable. *Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994). Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*, 146 F.3d at 390.

Once an alien establishes past persecution, he enjoys a presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). The burden then shifts to the government to rebut that presumption by showing that conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return. *Id.* § 208.13(b)(1)(i)(A). "The INS must do more than show that circumstances in the country have fundamentally changed; the INS must also show that such change negates the particular applicant's well-founded fear of persecution." *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003). Even if the presumption is successfully rebutted, however, the applicant may still be eligible for asylum based purely on past persecution by demonstrating "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution[.]" 8 C.F.R. § 208.13(b)(1)(iii)(A); *see also Matter of Chen*, 20 I. & N. Dec. 16, 19 (BIA 1989).

For an alien to be entitled to withholding of removal, he must show that it is more likely than not that if he returns to his home country he will be persecuted on account of his race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.16(b)(2). Once that is demonstrated, the relief is automatic. 8 U.S.C.S. § 1231(b)(3)(A); 8 C.F.R.

§ 208.16(b)(1). The burden of proof for withholding of removal is more exacting than that for asylum. *Mikhailevitch*, 146 F.3d at 391. Thus, an alien who does not qualify for asylum *a fortiori* cannot meet the higher standard for withholding of removal. *Id.*; *Guang Run Yu v. Ashcroft*, 364 F.3d 700, 703 n.3 (6th Cir. 2004).

Cancellation of removal is a discretionary remedy based on the following criteria: the applicant must have been continuously present in the United States for at least ten years, he must have been of good moral character during those ten years, he must not have been convicted of any of the certain enumerated offenses, and he must demonstrate that removal would result in extremely unusual hardship for his parent, spouse, or children who are U.S. citizens. INA § 240A(b), 8 U.S.C. § 1229b(b). Although the INA establishes certain prerequisites to eligibility for cancellation of removal (formerly called suspension of deportation), it imposes no limitations on the discretionary factors that the Attorney General or his delegate, the IJ, may consider in determining who, among the class of eligible aliens, should be granted the relief. *Marji v. GonzalesI*, 166 F. App'x 197, 199 (6th Cir. 2006). Grant of cancellation of removal is akin to "an act of grace" accorded pursuant to the immigration judge's sole discretion. *Id.* (internal quotation marks omitted) (quoting *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996)). In *United States ex rel. Kaloudis v. Shaughnessy*, Judge Learned Hand likened it to "'a judge's power to suspend the execution of a sentence, or the President's to pardon a convict.'" 180 F.2d 489 (2d Cir. 1950); *see also Jay v. Boyd*, 351 U.S. 345, 354, n.16 (1956) (quoting *Kaloudis*, 180 F.2d at 491); *Yueh-Shaio Yang*, 519 U.S. at 30. In short, even if an alien satisfies the conditions to qualify for relief, the Attorney General, and thus the immigration judge to whom the Attorney General's power is delegated, retains discretion to grant or deny the application. *Sad v. INS*, 246 F.3d 811, 819 (6th Cir. 2001) (citing *Babai v. INS*, 985 F.2d 252, 253 (6th Cir. 1993)).

## 1. Subject matter jurisdiction

Mateo argues that this Court has jurisdiction to review the BIA's denial of all three forms of relief because the appeal is from a final BIA order that disposes of all of the parties' claims. (Pet'r Br. at 4.) The government argues that, under 8 U.S.C. § 1252(a)(2)(B)(i) and *Abu-Khaliel v. Gonzalez*, 436 F.3d 627, 630-31 (6th Cir. 2006), this Court lacks jurisdiction to review the denial of petition for cancellation of removal to the extent the decision was based on a discretionary determination that Mateo failed to establish extremely unusual hardship and good moral character. (Resp't Br. at 1-2, 9-10, and 13-17.)

Mateo has exhausted all administrative remedies available to him, and the order from which he is appealing is final. 8 U.S.C. §§ 1252(b), 1252(d). Removal orders become final once the BIA affirms the order or the period during which the alien can file his appeal expires. 8 U.S.C. § 1101(a)(47)(B). Generally, this Court lacks jurisdiction to review all discretionary elements of statutory eligibility for cancellation of removal. 8 U.S.C. § 1252(a)(2)(B)(i); *see also Abu-Khaliel*, 436 F.3d at 630-31. Findings of both moral character and hardship are considered discretionary. *Valenzuela-Alcantar v. INS*, 309 F.3d 946, 949 (6th Cir. 2002); *Kalaw v. INS*, 133 F.3d 1147, 1151-52 (9th Cir. 1997). As Mateo argues, however, this Court has jurisdiction pursuant to 8 U.S.C. § 1252(a)(2)(D), which allows judicial review of constitutional claims, because Mateo argues that the IJ's decision violated his Fifth Amendment right to due process when the IJ failed to consider all of the evidence that was admitted. (Pet'r Br. at 16-17; Pet'r Reply Br. at 3.)

The government also argues that this Court lacks jurisdiction because Mateo raises issues

here that were not presented to the BIA,[2] namely, that he had been persecuted on account of an alleged political opinion when he told the guerrillas that he did not want their "problems." (Resp't Br. at 10.) The assertion that the issue was not raised before is unconvincing. In his I-589 asylum application describing why he would not return to Guatemala, Mateo stated that he might be killed "for preferring to work rather than helping to kill[.]" (J.A. at 179.) In his testimony during the evidentiary hearing, Mateo further expanded this assertion, stating that the guerrillas wanted to kill him "because [he] didn't want to participate with them." (J.A. at 29-30.) Mateo testified as follows: "Well, I didn't want to do what they wanted me to do. They were against me." (J.A. at 31.) To this, the guerrillas said "you don't like what we do. . . . [O]ne of these days, we are going to kill you, because you don't want to do what we do." (J.A. at 31.) The claim of persecution on account of political opinion was reiterated by Mateo in his notice of appeal: "Mateo stated that the reason he feared being persecuted by the rebels was that he told them he didn't want to participate in their fight. The rebels knew he did not agree with their goals because he told them so upon being solicited by the rebels." (J.A. at 9.) Throughout the removal proceedings, Mateo has raised the claim, no matter how weak, that he was persecuted on account of his political opinion. This Court has subject matter jurisdiction.

### 2. Failure to establish a nexus between fear of persecution and political opinion

---

[2] In arguing that this court lacks jurisdiction, the government also points out that the petitioner raised new issues on his appeal to the BIA, claims that had not been raised during his evidentiary hearing. (Resp't Br. 2 and 9.) In support of its position, the government refers to the BIA's conclusion that some of the petitioner's claims on appeal were inconsistent with his prior testimony, such as his claims that he was hunted in every country where he resided and that he was arrested and beaten in Guatemala. None of these allegedly inconsistent statements was fully briefed, there are no other references to them in the Joint Appendix, and they do not affect the outcome of this case. Therefore, these claims are not addressed.

Mateo argues that he has been persecuted in the past on account of his political opinion because, when he was expressing his opposition to the cause of the guerrillas, he was expressing a political opinion. (Pet'r Br. at 7.) Analogizing to *Elias-Zacarias*, the IJ concluded that Mateo had not offered testimony about his own political opinion and, therefore, had not proven past persecution or a well-founded fear of future persecution on account of a protected ground. Mateo argues that the instant case is distinguishable because the incident here does not constitute conscription or involuntary military service, as in *Elias-Zacarias*, but instead demonstrates that Mateo was opposing and resisting a practice of terror, the killing and robbing of innocent people, perpetrated by the guerrillas. (Pet'r Br. at 10.) By refusing to subscribe to the rebels' political agenda, the goal of which was the violent overthrow of the Guatemalan government, Mateo argues that he was expressing his political opinion. (Pet'r Br. at 11.)

The government argues that this Court should apply the *Elias-Zacarias* Court's conclusion that a guerrilla group's attempt to force someone to join it, without proof that the alien's resistance was motivated by his political opinion, does not suffice to show persecution on the ground of political opinion. (Resp't Br. at 19-20.) In his reply brief, Mateo argues again that his statement that he did not want to be involved with the guerrillas was a political opinion, namely, his disagreement with the guerrillas' violent tactics, which corresponded to the group's political goals. (Pet'r Reply Br. at 7.)

The IJ ruled that Mateo could not establish past persecution on account of a protected ground (which would provide a rebuttable presumption of a well-founded fear of future persecution) or a well-founded fear of future persecution on account of a protected ground. In its oral decision, the

IJ noted that Mateo "offered no testimony concerning his own political opinion," and "failed to show an objective well-founded fear of persecution in light of the end of the civil war in Guatemala." (J.A. at 16.) The IJ focused on Mateo's inability to show a nexus between any alleged fear of persecution and a protected ground.[3] This finding is supported by substantial evidence.

There is little evidence in the record that the guerrillas' threats were based on Mateo's political activities or opinion. It appears that Mateo never engaged in any political activity, either before or after moving to the United States. Mateo's I-589 asylum application and his testimony at the hearing reveal that he knows little about the politics of his home country, merely stating that the guerrillas might kill him for talking to government soldiers, and that the soldiers might kill him for not telling them who might be communist guerrillas (Mateo states that the government assumes that all farmers are communist guerrillas). The IJ found that Mateo was not "politically offensive" and that he had offered no testimony about his political opinion. Mateo has cited no evidence that would call this finding into question. In addition, Mateo offered no evidence that any of his family members or friends were persecuted or targeted before or after he left Guatemala. Although Mateo might have refused to join the guerrillas because he opposed their tactics, his refusal does not necessarily lead to an inference that he was threatened by the guerrillas on account of his political opinion, which would have lead him to disagree with the guerrillas' political goals. Given the lack of corroborating evidence and the absence of any indication that this incident constituted persecution on account of a protected ground, Mateo cannot overcome the IJ's conclusion that he has failed to

---

[3] The IJ also noted that, even if Mateo had proven past persecution on account of political opinion, the end of the civil war in Guatemala would make it impossible for him to prove a well-founded fear of future persecution.

show past persecution.

Substantial evidence also supports the IJ's conclusion that Mateo cannot show a well-founded fear of future persecution. 8 C.F.R. § 1208.13(a). Because Mateo has failed to show past persecution from which a well-founded fear of future persecution could be presumed, he must independently establish a well-founded fear of future persecution by showing that he has such a fear on account of his political opinion, that there is a reasonable possibility of suffering such persecution if he were to return, and that he is unable or unwilling to return because of his fear. *Mikhailevitch*, 146 F.3d at 389. The fear of persecution must be both subjectively genuine and objectively reasonable. *Perkovic,* 33 F.3d at 620-21.

After citing the Country Report that indicates the end of the civil war in Guatemala, the IJ found that any fear of future persecution Mateo might have would not be objectively reasonable. Substantial evidence supports this conclusion. Mateo does not point to any evidence in the record that calls the Country Report into question. *See Diallo v. Gonzales*, 140 F. App'x 612, 616 (6th Cir. 2005) ("Because Diallo has put forth little or no persuasive evidence to counter the INS's evidence of changed conditions for the Black Maurs in Mauritania, the record does not compel a finding that the INS failed to rebut Diallo's presumption of future persecution based on race.") Although acknowledged as occasionally problematic, Country Reports are nonetheless "'the best source of information on conditions in foreign nations.'" *Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006) (quoting *Mullai*, 385 F.3d at 639). Mateo has put forth no evidence that there is a reasonable possibility that he would suffer persecution upon returning to Guatemala. As noted above, he has engaged in no political activity. Thus, he has failed to show that he has an objectively reasonable

-14-

fear of being persecuted on that ground. Even if he had been politically active, however, the Country Report indicates that, although there is a danger of violence in Guatemala, that danger appears to be due to societal problems, individual acts, or organized crime.

Despite making general assertions that he fears death upon his return to Guatemala, Mateo offers no evidence that he will personally be subjected to persecution upon return. This Court has held that an applicant "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." *Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004) (citation omitted). In his I-589 application, Mateo stated that poor, uneducated farm laborers living in rural areas, like himself, were easy targets for both military soldiers and guerrillas. During his evidentiary hearing, he further testified that he fears the guerrillas because they came to take him from his house and he had to hide. Mateo has put forth no evidence, at any level, that he has a well-founded fear of future persecution. Substantial evidence supports the IJ's denial of asylum.

Because the denial of asylum was supported by substantial evidence, Mateo's claim for withholding of removal must also be denied. To be entitled to withholding of removal, Mateo must show that it is more likely than not that, if he returns to his home country, he will be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3); 8 C.F.R. 208.16(b)(2). The burden of proof for withholding of removal is more exacting than that for asylum. *Mikhailevitch*, 146 F.3d at 391. Because Mateo does not qualify for asylum, he cannot meet the higher standard for withholding of removal. *Id.*; *Yu*, 364 F.3d at 703 n.3.

### 3. Findings of lack of good moral character and lack of exceptional and extremely unusual hardship

Pursuant to 8 U.S.C. § 1252(a)(2)(B)(i), this court has no jurisdiction to review denials of discretionary relief, including cancellation of removal. This court does have jurisdiction, however, to review constitutional claims. 8 U.S.C. § 1252(a)(2)(D). Because Mateo twice characterizes the IJ's findings that he lacks good moral character and that his removal would not result in hardship as violations of due process, (Pet'r Br. at 16-17; Reply Br. at 5), and because this Court has jurisdiction to review those claims only if framed as violations of constitutional claims, we review Mateo's arguments in the context of due process.

Mateo argues that the IJ erred in finding that Mateo failed to demonstrate that he is a person of good moral character and that his removal would cause his two U.S. citizen children to suffer exceptional and extremely unusual hardship. Mateo argues that the IJ based his determination about good moral character on a single criterion, the fact that his tax returns are not complete or even filed,[4] to the exclusion of all other evidence presented, including three character witnesses who were ready to testify. In his brief, Mateo points out that he had relied on someone else to prepare his tax returns and that he does not understand tax laws. Mateo reads the IJ's remark that "I don't think I need to hear from them," referring to the character witnesses, as indicating that the IJ had made up his mind about Mateo's character based on the income tax returns alone.

Mateo also argues that the IJ ignored the cumulative effect Mateo's removal would have on his American children. In his brief, Mateo emphasizes the need to consider the totality of the

---

[4] The returns include factual inconsistencies, are incomplete, contain handwritten notes, and appear to have been backdated and not filed. (J.A. at 151-74.)

circumstances, including the fact that his children would suffer economic hardship and great difficulty assimilating to a culture foreign to them, and that they would be exposed to the danger of child labor, lack of education, and malnutrition and abuse, all factors listed in the Country Report, which Mateo contends the IJ improperly disregarded.

In denying cancellation of removal, the IJ credited Mateo with a ten-year presence in the United States. The IJ noted that the tax records that were submitted by Mateo were not convincing. Based on this factor, the IJ noted that "the Court cannot conclude that the respondent is a person of good moral character, because it is not clear from these [tax] returns that they were even filed." (J.A. at 17.) The IJ did, however, find that Mateo's conviction for filing a false police report and resisting arrest (committed while Mateo was helping to hide a man accused of domestic violence) did not bar a finding of good moral character.

After referring to *Matter of Montreal*, 23 I. & N. Dec. 56 (BIA 2001), *Matter of Andazola*, 23 I. & N. Dec. 319 (BIA 2002), and *Matter of Recinas*, 23 I. & N. Dec. 467 (BIA 2002), the IJ found no evidence that Mateo's removal would result in exceptional and extremely unusual hardship to Mateo's two U.S. children. The IJ considered the limited educational opportunities and lower standard of living in Guatemala, the daughters' good health, their ability to speak Spanish and Chu, and the presence of an extended family network in Guatemala.

Mateo claims that he was deprived of procedural due process at his hearing because the IJ did not consider evidence that would have established that he qualified for cancellation of removal. (Pet'r Br. at 17, Pet'r Reply Br. at 3-6.) Fifth Amendment guarantees of due process extend to aliens in deportation proceedings, entitling them to a full and fair hearing. *Dokic v. INS*, No. 92-

3592, 1993 U.S. App. LEXIS 19027, at *9 (6th Cir. July 15, 1993) (citing *Baires v. INS*, 856 F.2d 89 (9th Cir. 1988)). To constitute fundamental unfairness, a defect in the removal proceedings "must have been such as might have led to a denial of justice[.]" *Id.* (quoting *Ramirez v. INS*, 550 F.2d 560, 563 (9th Cir. 1977)). The alien carries the burden of establishing that he was denied fundamental fairness to prove that he has suffered a denial of due process. *Hamid v. Ashcroft,* 336 F.3d 465, 468 (6th Cir. 2003) (quoting *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001)); *see also Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 155 (2d Cir. 2006).

To prevail on a due process claim, a petitioner must establish that, but for the IJ's failure to consider all of the evidence offered, he would have been entitled to cancellation of removal. *Huicochea-Gomez*, 237 F.3d at 699-701. The failure to obtain discretionary relief does not automatically amount to a deprivation of a liberty interest. *See Mejia Rodriguez v. Reno*, 178 F.3d 1139, 1146 (11th Cir. 1999).

Cancellation of removal is an extraordinary remedy. It is too speculative for Mateo to claim that, but for the IJ's failure to consider all of the evidence, he would not be facing removal or would have been granted the discretionary relief he seeks. An alien is denied due process where he is deprived of a meaningful opportunity to be heard at his deportation hearing. *Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999); *Podio v. INS*, 153 F.3d 506, 509-10 (7th Cir. 1998). Here, due process was not denied. The IJ considered the background materials submitted, referred to the applicable case law and the facts on the record, and actively participated in the hearing.

Even if reviewing or considering additional evidence had resulted in a finding of good moral character, Mateo would have been denied cancellation of removal. *Kuciemba v. INS*, 92 F.3d 496,

501 (7th Cir. 1996) (finding that a petitioner must produce "concrete evidence" indicating that the due process violation "had the *potential* for affecting" the outcome of the hearing) (emphasis in original); *United States v. Gonzalez-Mendoza*, 985 F.2d 1014, 1017 (9th Cir. 1993); *Roman v. Ashcroft*, 181 F. Supp. 2d 808, 815-16 (N.D. Ohio 2002), *vacated on other grounds*, 340 F.3d 314 (6th Cir. 2003). Had the IJ heard the three good moral character witnesses and found Mateo to have good moral character despite his suspect tax records, the outcome would not have changed. Hardship—not moral character—was the IJ's principal concern when he denied relief. The IJ considered that Mateo's American children have an extended family in Guatemala, speak Spanish and Chu, have two parents to provide for them, and do not have any special needs. The IJ balanced those considerations against the lower standard of living and fewer educational opportunities in Guatemala and concluded that removal would not result in extremely unusual hardship. Mateo was not denied due process.

### III. CONCLUSION

For all of the reasons set forth above, we **DENY** Mateo's petition for review of the BIA's order affirming the IJ's decision to deny his claim for asylum, withholding of removal, and cancellation of removal.