NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0067n.06

No. 19-3058

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 30, 2020
DEBORAH S. HUNT, Clerk

TALANTBEK AKMATOV,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

ON PETITION FOR REVIEW FROM
THE UNITED STATES BOARD OF
IMMIGRATION APPEALS

BEFORE: MERRITT, CLAY, and BUSH, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner Talantbek Akmatov asks this Court to review the Board of Immigration Appeals' denial of his application for asylum and withholding of removal. *See* 8 U.S.C. §§ 1158, 1231(b)(3). For the reasons set forth below, Akmatov's petition is denied.

## I. BACKGROUND

Talantbek Akmatov is a citizen of Kyrgyzstan, where he previously served as a police officer. In this role, Akmatov investigated organized crime, including members the "Kolbayev mafia"—criminals associated with alleged crime boss Kamchy Kolbayev. (A.R. at 216, 292–93.) According to Akmatov, he and other officers repeatedly confronted members of the Kolbayev mafia, including in gunfights, and arrested members on several occasions. But in many cases, prosecutors released the arrestees without charges.

During his campaign against the Kolbayev mafia, Akmatov says he faced threats and violence from the suspects he pursued. For example, on two occasions, Akmatov received anonymous phone calls threatening him if he continued his investigations. In two other cases, Akmatov was injured during police actions; his assailants were charged with attempted murder.

- 1 -

And in 2010, the front door of Akmatov's apartment was set on fire, allegedly by members of the Kolbayev mafia.

Based on these threats and attacks, Akmatov resigned from the police force and fled to the United States. In his visa application, Akmatov falsely claimed that he worked for a construction company and was coming to the United States to visit a relative. The visa was approved, and he arrived in the country on October 24, 2012.

About one month before his visa expired, Akmatov submitted an application for asylum and withholding of removal to the Department of Homeland Security ("DHS"). In his application, Akmatov described his belief that Kolbayev had ordered his murder, and that his life would be forfeited if he returned to Kyrgyzstan. Specifically, Akmatov noted that in Kyrgyzstan, he "received phone calls with threats from uncertain numbers, some times [they] set fire to a door of [his] apartment . . . , [and] three times [his] life was exposed to attempt, [when] members [of the] criminal group shot at [him]" in their quest for revenge. (*Id.* at 664.)

Akmatov also submitted several documents in support of his application. For example, he provided two documents labeled "Copy of Investigative Report . . . stating that Police Captain Talantbek Akmatov was hospitalized from being wounded by a 9 MM gun shot," which described two separate alleged shootings. (*Id.* at 325, 341.) The documents themselves, which had been translated from Russian to English, said that Kolbayev mafia members had opened fire at Akmatov, resulting in his hospitalization "with wounds to the body" or "with body wounding," respectively. (*Id.* at 326, 342.) While the text of these documents is somewhat unclear, Akmatov also submitted an affidavit saying that he was shot and "hospitalized with gunshot wounds" on two occasions. (*Id.* at 311–12.)

Akmatov's documents also discussed the arson at his home and the threatening phone calls he received. For example, his affidavit noted that on April 5, 2010, "the front door of [his] apartment . . . was set on fire." (*Id.* at 311.) Akmatov said that he "remembered this well because it was exactly two days before the April revolution" in Kyrgyzstan. (*Id.*) The affidavit further detailed several threatening phone calls he received before leaving Kyrgyzstan, and noted that his family continued to receive threatening phone calls after he left the country. And in 2013, Akmatov says his wife was attacked and was asked where he was, after which his family moved in with his wife's grandparents.

After interviewing Akmatov, DHS refused to grant his application, finding that he was not credible based both on inconsistencies within his testimony and on inconsistencies between his testimony and the other evidence he submitted. DHS referred Akmatov's asylum application to an immigration judge and issued a notice to appear alleging that Akmatov was removable for overstaying his visa.

At an immigration court hearing, Akmatov testified that his asylum application and affidavit were read back to him in a language he understood and that he determined those documents were "complete and accurate." (*Id.* at 191–94.) But when asked, Akmatov testified that he had never been shot, despite the contrary statements in his affidavit:

> Q. . . . Were you ever shot in your country, ever?
>
> A. At that time, at that time of the arrest there were shots fired toward us, but I, I never got any shots personally.
>
> Q. Okay. So, and I'm talking about the entirety of your life in your country, sir. Have you ever been victimized by a gunshot, by a gun? Have you ever been shot on your body with a firearm at any time?
>
> A. No.

(*Id.* at 255.)

The government's attorney confronted Akmatov about this inconsistency:

> Q. Sir, why do we have a document that describes Police Captain Talatbek Akmatov [sic] being wounded by a 9 millimeter gunshot?
>
> A. It, it should, it's not possible, it may be the translation was [indiscernible]. The, I said that there were shots fired for the, but I was never hit.
>
> Q. Okay. Why don't I ask you the question slightly differently, sir? . . . [In your affidavit,] you describe various individuals fired on you causing injury to you. You continue by stating the following. I was hospitalized for gunshot wounds from this incident. Why does your asylum application say this, sir, if it never happened?
>
> A. This, no, no, I never wrote that. Maybe it was mistranslation, but this is not what I write.

(*Id.* at 256 (second alteration in original).) Akmatov also testified that he originally wrote his affidavit in Russian, but in his later briefing, Akmatov claimed that his attorney was the one who prepared the affidavit and that Akmatov "was never told specifically line by line what the affidavit or application said." (*Id.* at 26–27.)

Akmatov also ran into trouble with respect to the timing of the fire at his apartment. At the hearing, Akmatov testified that his wife was pregnant with their son at the time of the fire, which is why he immediately moved them after the incident. But this created a conflict with his asylum application. While the application claimed that the fire occurred just before the April revolution in 2010, Akmatov's son was born in April 2011, meaning his wife could not have been pregnant in April 2010. The government's attorney confronted Akmatov with this discrepancy, which led to the following exchange:

> Q. . . . I'm going to read to you from your asylum statement. I want you to explain this to us. . . . Sir, you say the following. On April 5th, 2010 the front door of my apartment . . . was set on fire. I remember this well because it was exactly two days before the April revolution in my country. Sir, is this information truthful? Yes or no?

A. Yes, that's correct.

Q. Okay. Now, sir, a minute ago you told us that the incident with the door on fire actually happened in 2011. And you've also told us that your wife was pregnant at the time. Are you able to recall, sir, when your door was set on fire?

A. Before the revolution my door was set on fire.

Q. Okay. Was it two days before the revolution?

A. Two days before. Either 4th or the 5th.

Q. Okay. And so, sir, your wife wasn't pregnant at that time was she?

A. At that time she was with my daughter.

Q. Was she pregnant at that time? Yes—

A. No, at that time she was not.

Q. Why did you tell us she was, sir?

A. While she was pregnant I took her to her parents' house. Maybe I, I, I probably mixing it with that.

(*Id.* at 253.)

After this hearing, the immigration judge denied Akmatov's application for asylum and withholding of removal. The court found that Akmatov was not credible, and so his testimony could not establish his eligibility for relief. Specifically, the immigration judge found that Akmatov had lied in his visa application, was inconsistent with respect to the date of the fire at his apartment, and was inconsistent as to whether he was ever shot by members of the Kolbayev mafia. The court also found that even if Akmatov were credible, his testimony and other evidence were still insufficient to demonstrate a well-founded fear based on his status as a former police officer. This is because "his family has lived without threats or contact with the criminal element from May 2013 to the present," and it would be illogical for the Kolbayev mafia to pursue Akmatov years after leaving the police force. (*Id.* at 162.)

Akmatov moved for reconsideration, arguing that the immigration court erred in its credibility determination.[1] As to the gunshot issue, Akmatov argued that his Russian documents were mistranslated, demonstrating this with new translations that agreed with his hearing testimony. Because Akmatov's attorney used these incorrect translations to prepare his affidavit, and Akmatov claims he was never told line by line what the affidavit said, he never had a chance to correct this mistake before the hearing. Akmatov also argued that the inconsistency regarding the fire was a poor test for credibility, and similarly that the false visa application cannot be used against Akmatov in a later asylum proceeding when the falsity was unrelated to his asylum claim.

Because the thirty-day deadline to appeal was expiring, Akmatov appealed to the Board of Immigration Appeals ("BIA"), even though the immigration judge had not yet addressed his motion to reconsider. In his brief, Akmatov essentially restated the arguments in his motion to reconsider, which he asked the BIA to construe as a motion to remand the case back to the immigration judge. Akmatov also argued that the immigration judge's finding on his fear of harm was "complete speculation," since he "can never undo his past and what he did to anger organized crime." (*Id.* at 30–31.)

The BIA affirmed the immigration judge in a separate opinion. First, the BIA found that the court's credibility determination was not clearly erroneous, pointing to the inconsistencies regarding the date of the fire and the discrepancies between Akmatov's affidavit and his hearing testimony as to whether he was shot. While Akmatov argued that the fire issue was just a mix-up of dates, the BIA found this was "not persuasive because he testified that his wife [both] was and was not pregnant at the time." (*Id.* at 4.) Similarly, even though Akmatov blamed the shooting

---

[1] Akmatov's motion did not challenge the immigration judge's alternative finding that his testimony, even if credible, was insufficient to establish a well-founded fear of harm.

issue on the erroneous translations, the BIA noted that he had an opportunity to correct this mistake and instead confirmed the documents' accuracy to the immigration court. Unlike the immigration judge, the BIA did not consider the fact that Akmatov lied on his visa application in assessing his credibility.

Second, the BIA found that even if he were credible, Akmatov's testimony would still not establish a well-founded fear of future persecution, since Akmatov failed to prove that he would still be singled out for retribution even after he resigned from the police force. And third, while Akmatov had submitted new translations in connection with his motion to reconsider, he failed to show "that the new translations of documents could not have been discovered or presented at the former hearing" or that they "would likely change the result in [his] case," both prerequisites for a motion to reconsider. (*Id.* at 5 (quoting *Coelho*, 20 I. & N. Dec. 464, 473 (B.I.A. 1992)).) Thus, the BIA affirmed the decision of the immigration judge, and Akmatov petitioned this Court for review.

## II.  DISCUSSION

### A.  Standard of Review

"On petitions from BIA decisions, we review questions of law *de novo*, but 'substantial deference is given to the BIA's interpretation of the [Immigration and Nationality Act] and accompanying regulations.'" *Shaya v. Holder*, 586 F.3d 401, 405 (6th Cir. 2009) (quoting *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009)). This deference only extends "to BIA interpretations of its own empowering statutes and regulations only, not to BIA interpretations of other state or federal laws." *Id.* On the other hand, the BIA's factual findings are reviewed for "substantial evidence" and may be reversed only "if the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Haider v. Holder*, 595 F.3d 276, 281 (6th Cir. 2010) (quoting *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)); *accord, e.g.*, *Zaldana Menijar v. Lynch*, 812 F.3d 491,

497–98 (6th Cir. 2015); *see also* 8 U.S.C. § 1252(b)(4)(B) ("[The BIA's] findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary . . . .").

Even more deference is provided to the BIA when a noncitizen appeals the denial of a motion to reconsider or reopen, which is reviewed only for an abuse of discretion. *E.g.*, *Bi Feng Liu v. Holder*, 560 F.3d 485, 489–90 (6th Cir. 2009); *Barry v. Mukasey*, 524 F.3d 721, 724 (6th Cir. 2008); *Sinistaj v. Ashcroft*, 376 F.3d 516, 519 (6th Cir. 2004). Under this standard, we will only reverse the BIA when its decision "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Barry*, 524 F.3d at 724 (quoting *Haddad v. Gonzales*, 437 F.3d 515, 517 (6th Cir. 2006)). The BIA has broad discretion to grant or deny these motions, and thus the party seeking relief faces a "heavy burden." *Id.* (quoting *Alizoti v. Gonzales*, 477 F.3d 448, 451 (6th Cir. 2007)).

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Khalili*, 557 F.3d at 435 (citation omitted).

**B. Credibility Determination**

In his petition for review, Akmatov challenges the BIA's credibility determination, largely repeating the same arguments he made there. Success on this point is critical, because an application for asylum or withholding of removal cannot survive an adverse credibility determination. *E.g.*, *Slyusar v. Holder*, 740 F.3d 1068, 1072–74 (6th Cir. 2014); *Zhao v. Holder*, 569 F.3d 238, 243 (6th Cir. 2009); *Ndrecaj v. Mukasey*, 522 F.3d 667, 674–76 (6th Cir. 2008); *see*

*also El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009) ("The same credibility standard applies to claims for asylum, withholding of removal, and for relief under the torture convention.").

When assessing an applicant's credibility, the immigration judge can rely on "'all relevant factors' including the applicant's demeanor and the consistency and plausibility of the various statements." *Ndrecaj*, 522 F.3d at 674 (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). Under the REAL ID Act, inaccuracies in an applicant's written statements or testimony can support an adverse credibility finding even if they do not "go[] to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii); *see also, e.g.*, *Marikasi v. Lynch*, 840 F.3d 281, 287 n.1 (6th Cir. 2016) (discussing the REAL ID Act credibility standard); *Slyusar*, 740 F.3d at 1072–73 (same). Even so, the immigration judge's "speculation and conjecture cannot form the basis of an adverse credibility finding." *Marouf v. Lynch*, 811 F.3d 174, 180 (6th Cir. 2016) (quoting *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005)).

When it comes to our review, "an adverse credibility determination is treated as a finding or conclusion of fact, and is therefore subjected to review under the 'substantial evidence' standard." *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007). Under this standard, the immigration judge's credibility determination must be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Pilica v. Ashcroft*, 388 F.3d 941, 952 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). "While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Ndrecaj*, 522 F.3d at 674 (quoting *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004)).

In this case, substantial evidence supports the immigration judge's adverse credibility determination. First, the conflict between Akmatov's affidavit and hearing testimony regarding whether he was shot and hospitalized for gunshot wounds supports an adverse credibility finding.

To be sure, "[w]hen evaluating credibility, an [immigration judge] should be sensitive to misunderstandings caused by language barriers, the use of translators, and cultural differences." *Marouf*, 811 F.3d at 180–81 (quoting *Reyes-Cardona v. Holder*, 565 F. App'x 366, 367 (6th Cir. 2014) (per curiam)). But here, Akmatov's own affidavit included the embellished version of events. Akmatov swore that the affidavit was read back to him in a language he understood and was true and accurate, only to deny this when the discrepancy between his testimony and the affidavit was later brought to light. Even accounting for potential translation issues with his documents, under these facts, we are not "compelled to conclude" that the immigration judge erred in finding that Akmatov was not credible. *Pilica*, 388 F.3d at 952 (quoting 8 U.S.C. § 1252(b)(4)(B)).

Akmatov further argues that this discrepancy cannot implicate his credibility because his verbal testimony presented a less-severe version of events, meaning he was not embellishing his asylum claim. But nothing in our law suggests that the noncitizen's verbal testimony must be what was wrongly bolstered; the immigration judge was entitled to discredit Akmatov's claims based on his inaccurate written submissions as well. *See Kaba v. Mukasey*, 546 F.3d 741, 750 (6th Cir. 2008) (affirming an adverse credibility determination based on an embellishment in the petitioner's written submissions that conflicted with later verbal testimony).

Similarly, the BIA did not err in denying Akmatov's motion to remand the case to the immigration judge based on the new translations he provided. To be eligible for that relief, Akmatov would have to show that the new evidence he seeks to present was previously unavailable to him. *See, e.g.*, *INS v. Doherty*, 502 U.S. 314, 323 (1992); *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005); *see also Alizoti*, 477 F.3d at 452 (noting that motions to reconsider based on new evidence are properly construed as motions to reopen and assessed under that standard). But

Akmatov had all the evidence in hand at the time of the hearing and was the one who supplied the incorrect translations in the first place. His after-the-fact decision to have the documents retranslated does not make this evidence unavailable for purposes of his motion to remand. *See Allabani*, 402 F.3d at 675 ("The evidence that Allabani submitted to the Board was available at his former hearing. But for the mistake of counsel, these documents would have been considered . . . ."). The BIA did not abuse its discretion in denying Akmatov's motion.

The BIA's findings with respect to the date of the fire also support its affirmance of the immigration judge's credibility determination. Akmatov says this should be written off as a minor lapse in memory, but this discrepancy was between two key events that seem difficult to conflate: the April 2010 revolution and the 2011 birth of his son. In fact, Akmatov wrote in his affidavit that he "remembered this [date] well because it was exactly two days before the April revolution in [his] country" (A.R. at 311), suggesting the error was more than a simple case of mistaken dates. And while Akmatov cites an out-of-circuit case for the proposition that a mix-up in dates alone should not give rise to an adverse credibility finding, that case concerned whether a specific incident happened on the second or third day of the petitioner's detention, facts that differ considerably from the major discrepancy at issue here. *Ren v. Holder*, 648 F.3d 1079, 1085–86 (9th Cir. 2011).

Even before the REAL ID Act was adopted, while "minor inconsistencies 'in dates which reveal nothing about an asylum applicant's fear for his safety' . . . would be an inadequate basis for the adverse credibility finding, their cumulative effect gives support to the other grounds" for finding a lack of credibility. *Yu v. Ashcroft*, 364 F.3d 700, 704 (6th Cir. 2004) (citation omitted) (quoting *Senathirajah v. INS*, 157 F.3d 210, 221 (3d Cir. 1998)). When combined with the other inconsistencies identified by the immigration judge, the discrepancies regarding the timing of the

fire provide further support for the court's adverse credibility finding. *See, e.g.*, *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007) ("After a review of each individual basis used to support the IJ's adverse credibility finding, we conclude that while many were irrelevant, or in fact, not even inconsistent, there is sufficient inconsistency in the record to support the IJ's conclusion, especially in light of the extremely deferential standard of review to which we must adhere.").

Finally, while Akmatov also challenges the immigration judge's reliance on his fraudulent visa application, the BIA issued its own opinion in this case and did not rely on the visa issue in affirming the immigration judge's credibility finding. Accordingly, we will not address this issue either. *See, e.g.*, *Juan-Pedro v. Sessions*, 740 F. App'x 467, 472–73 (6th Cir. 2018) (declining to address issues not reached by the BIA); *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010) (citing *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam)) (same).

## C. Well-Founded Fear of Persecution

Even if Akmatov were credible, the BIA did not clearly err in finding that his testimony failed to establish a well-founded fear of persecution. "An applicant can establish the persecution element in an asylum application by two alternative methods: (1) prove that he or she has suffered past persecution, or (2) show that he or she has a well-founded fear of future persecution." *Mapouya*, 487 F.3d at 412 (citing *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (per curiam)). Under the second method, the fear of future persecution "must be both subjectively genuine and objectively reasonable." *Id.* (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998)). While an applicant need not show that she is more likely than not to be persecuted, there must still be "a reasonable possibility" of persecution were she to return to the country in question. *Mikhailevitch*, 146 F.3d at 389. And in proving her claim, "an applicant 'cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer

reasonably specific information showing a real threat of individual persecution.'" *Mapouya*, 487 F.3d at 412 (quoting *Mateo v. Gonzales*, 217 F. App'x 476, 484 (6th Cir. 2007)); *accord, e.g.*, *Dieng v. Holder*, 698 F.3d 866, 872 (6th Cir. 2012).

Most of Akmatov's evidence concerns threats he faced in the course of performing his official police duties. These are occupational hazards of a dangerous job, not persecution based on membership in a particular social group. *Fuentes*, 19 I. & N. Dec. 658, 660–62 (B.I.A. 1988). That said, Akmatov could possibly support his asylum claim through a fear of future prosecution based on his status as a *former* police officer, which can be viewed as an immutable characteristic. *Id.* at 662. But the BIA found that Akmatov failed to substantiate this claim through sufficient evidence, and under the deferential standard of review in this case, we cannot say that the record compels a different result.

Akmatov's affidavit identifies several phone calls to his wife asking for him in 2013, and two incidents in the same year where unknown individuals approached his wife (in one case attacking her). But Akmatov could not point to any later interaction between possible Kolbayev mafia members and his family.[2] Given that the alleged threats to Akmatov all occurred while he was still a police officer or within a year of him leaving that job, and given that he reported no additional threats in the many years since then, the immigration judge was entitled to find that Akmatov failed to demonstrate a well-founded fear of future persecution. *See, e.g.*, *Ordonez v. Holder*, 446 F. App'x 750, 753 (6th Cir. 2011) (holding that a multiple-year period without further incidents can rebut a fear of future persecution); *Fuentes*, 19 I. & N. Dec. at 662 (rejecting a claim for future persecution by a former police officer when "his testimony relate[d] to events that

---

[2] Akmatov's asylum hearing was held in September 2017.

occurred while he was an active member of the government forces prior to his departure from El Salvador").

Since Akmatov has not shown either past persecution or a well-founded fear of future persecution, the BIA was correct to deny his claim for asylum. *See, e.g.*, *Mapouya*, 487 F.3d at 412; *Gilaj*, 408 F.3d at 283. This similarly dooms Akmatov's withholding of removal claim. *See, e.g.*, *Ndrecaj*, 522 F.3d at 677 ("[O]nce we conclude that Ndrecaj was ineligible for asylum because of his failure to show a well-founded fear of persecution, he is then automatically incapable of qualifying for withholding of removal."); *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (same).

## III. CONCLUSION

For the reasons stated above, we deny Akmatov's petition for review.