*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BLAISE MAPOUYA,

*Petitioner,*

*v.*

No. 06-3042

ALBERTO R. GONZALES,

*Respondent.*

On Appeal from the
Board of Immigration Appeals.
No. A96 278 252.

Submitted: March 13, 2007

Decided and Filed: May 18, 2007

Before: MARTIN and CLAY, Circuit Judges; POLSTER, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** John S. Richbourg, Memphis, Tennessee, for Petitioner. Surell Brady, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

POLSTER, D. J., delivered the opinion of the court, in which MARTIN, J., joined. CLAY, J. (pp. 16-21), delivered a separate dissenting opinion.

---

## OPINION

---

DAN AARON POLSTER, District Judge. Blaise Mapouya petitions for judicial review of an order rendered by the Board of Immigration Appeals ("BIA") denying his application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment of Punishment ("The Convention" or "Convention"). For the reasons set forth below, we **VACATE** and **REMAND** this case to the BIA for further proceedings.

---

[*] The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

## I.   BACKGROUND

Blaise Mapouya[1] is an ethnic Mbochi born in Brazzaville, Congo on January 4, 1970.  He fled Congo on March 20, 1999, and eventually entered the United States illegally through New York City on August 3, 2002, using a borrowed passport.  Mapouya made his way to Memphis, Tennessee, and in October 2002, he filed an application for asylum, withholding of removal, and relief under The Convention.[2]  On the application, Mapouya claimed asylum based on political opinion.  After recounting that Mapouya was subjected to violence and torture in the days of the 1997-98 Congolese civil war, the application included Mapouya's assertion that he would not return to Congo as long as Denis Sassou-Nguesso is president, "because I do not want to put my life in danger."

In April 2003, the INS charged that Mapouya was removable from the United States because he entered the country illegally.  At the initial hearing before the Immigration Judge ("IJ") in July 2003, Mapouya, through counsel, admitted the INS charge and conceded his removable status.  On May 3 and 6, 2004 the IJ conducted a hearing on Mapouya's requests for relief.  Mapouya produced evidence in support of his application including: the 2003 Department of State Country Report on Human Rights Practices for the Congo; several Amnesty International reports or documents; a United Nations High Commissioner for Refugees ("UNHCR") attestation letter issued in Gabon; his birth certificate; and two letters from individuals still living in Congo.  Mapouya presented one witness, Ibrahima Viong, and Mapouya also testified on his own behalf.

A recounting of recent events is necessary to better understand the details of Mapouya's testimony.  In the second half of 1997, violence and civil war returned to the Republic of Congo[3] (hereinafter "Congo") when Sassou-Nguesso, the country's former military strongman, ousted the country's first democratically elected president, Pascal Lissouba.[4]  Sassou-Nguesso, who had ruled Congo previously from 1979-91 after a coup, once again seized power militarily in October 1997 after several months of vicious fighting between government and militia troops loyal to Lissouba on one side, and Sassou-Nguesso's forces on the other.[5]  Angolan troops also crossed the southern border and intervened at different places on Sassou-Nguesso's behalf, including in the capital city of Brazzaville, which is located in the southeast region of the country.

Strong ethnic overtones are present in Congolese politics, and the 1997-98 civil war was no different.  Generally, the conflict can be characterized as pitting northerners, who supported Sassou-Nguesso and his Congolese Labour Party ("PCT"), against southerners, who supported former President Lissouba and former Prime Minister Bernard Kolelas.  The Mbochi, which are one of the larger Bantu ethnic groups, are located primarily in the northern regions of Congo.  Accordingly,

---

[1] There seems to be some confusion as to whether Petitioner's name is Blaise Mapouya, or Mapouya Blaise. We refer to Petitioner as Blaise Mapouya (and then "Mapouya") in this opinion based on the caption from appellate documents.

[2] The precise dates are not at issue; the government did not allege that the asylum application was untimely, and therefore the application is treated as timely.

[3] The Republic of Congo, also known as "Congo-Brazzaville" or "Congo," is not to be confused with the Democratic Republic of Congo.  The Democratic Republic of Congo (also known as "Congo-Kinshasa," "DR Congo," or "DRC") was formerly known as Zaire.  It is the larger of the two countries and lies to the east of the Republic of Congo.

[4] Lissouba was elected in 1992.

[5] Sassou-Nguesso's militia forces are called the Cobras.

the Mbochi are traditionally strong Sassou-Nguesso supporters, especially because Sassou-Nguesso is Mbochi as well. Conversely, supporters of Lissouba and his Pan-African Union for Social Development party (the translated acronym for which is "UPADS") are primarily southern Congolese tribes, which are mainly Lari ethnic groups. Any divergence from these ethnic-political affiliations, while not unheard of, is rare. Mapouya appears to be one of these few exceptions.

With this background in mind, Mapouya's testimony is as follows.

In October of 1997, Mapouya was living in Brazzaville and working as a housekeeper in the home of Albert Yangari, a Lari tribe member. While Yangari's official position is unknown, he was apparently a prominent Lissouba supporter and/or a high-ranking UPADS party official who worked directly under Lissouba. On October 15, 1997, approximately fifty armed soldiers in green uniforms broke into Yangari's house while Mapouya was there working. The intruders arrested Yangari and then summarily executed him. The men also shot and killed Yangari's wife and children. The soldiers arrested Mapouya as well, but when they learned he was Mbochi they did not kill Mapouya. Instead, the soldiers – who were also Mbochi – took him into custody and transported him to the central jail in Brazzaville. Mapouya's wife and child were not in Brazzaville at the time; Mapouya had previously requested Yangari's help to get his family out of the country in light of the surging violence a few months earlier.

The cell in which Mapouya was detained and held without counsel was extremely overcrowded and contained no furniture or bathroom facilities (aside from two tin cans which were to be used as toilets). Mapouya only left this cramped and crowded cell when soldiers came to take him into the basement for interrogation. The questioning centered around Mapouya's role with the UPADS and Yangari's relationship with Lissouba. When Mapouya told his captors he was just a regular UPADS member and knew nothing about his boss's activities, he was accused of lying. Consequently, the soldiers beat and tortured Mapouya with clubs and sticks. The beating lasted about an hour.

Mapouya was detained for three months, during which time he was similarly interrogated and beaten every morning. His captors finally released Mapouya because they had nothing with which to charge him, but they ordered Mapouya to remain within Brazzaville. To ensure that Mapouya followed their order to stay in the city, the soldiers also ordered him to report to the police station every week. Mapouya complied with the soldiers' orders initially, but each time he reported back to the police station, the soldiers threatened to kill him if he was not truthful. The soldiers also beat Mapouya during these visits to the police station, and after three consecutive weeks of the same treatment, Mapouya refused to report any further.

Government troops appeared at Mapouya's home in February of 1998, less than one month after his last report to the police station. They accused Mapouya of supporting Lissouba, and forcefully took him back into custody. The soldiers beat Mapouya when arresting him, and then again after they reached the central prison in Brazzaville. Mapouya was dumped in a cell without windows or furniture, along with approximately fifteen other detainees. Once a week Mapouya's captors would take him from the cell to a special torture room, where he was interrogated about his former boss's relationship with Lissouba. Although his captors and tormentors were also Mbochi, Mapouya "had a problem because of [his] boss."

Mapouya remained in custody without charge, subject to weekly torture sessions, for eleven months, at which point he was released. The soldiers, before releasing him, confiscated Mapouya's passport and the documents he held evidencing ownership of his house. Mapouya was also ordered to remain in Congo, but instead, Mapouya decided to flee Congo in search of his wife and child.

He headed for Gabon, which shares a border with Congo and to which Mapouya's wife and child had fled in 1997. To successfully cross the border in Gabon took Mapouya nearly eight months. Trying to enter Gabon undetected, Mapouya traveled and hid in the bush with a group of similarly-situated refugees, as the group attempted to find an unsecured stretch of border to cross. Gabon was generally opposed to allowing refugees into the country, but Mapouya eventually succeeded, and he managed to procure a UNHCR document in Gabon granting him refugee status until September 20, 2000 (a period of one year's time).[6]

The Gabonese authorities subsequently discovered Mapouya residing in the country illegally after the UNHCR document expired, and they informed Mapouya that he had to leave the country or be remanded into custody and returned to Congo. Fearing a return to Congo, Mapouya obtained another man's passport with the help of some friends and escaped to the United States.[7]

Mapouya also called Ibrahima Viong to testify during the immigration hearing. Viong, who is also Congolese but of Lari ethnicity, met Mapouya in Memphis a few days after Mapouya arrived in the United States. The two men did not know each other before meeting in Memphis. Viong's testimony consisted of his retelling the same story as recounted above, with the exception that Viong testified that Mapouya fled to Mali from Congo. Mapouya had previously testified that he fled to Gabon. Mapouya's counsel attempted to question Viong to clarify the discrepancy, but counsel for the government objected and the IJ sustained the objection. Mapouya's counsel did not rephrase his question or try to continue his line of questioning.

After considering the oral testimony and record evidence, the IJ entered an oral order denying Mapouya's applications and ordering his removal from the United States. In the order, the IJ found Mapouya not credible, based on three specific (alleged) inconsistencies discussed in detail below. The IJ then concluded that even if Mapouya was credible, he could not meet his burden of proof to sustain his asylum claims. The IJ cited two specific reasons for this conclusion: first, Mapouya provided no corroborating evidence to show what position Yangari held with the UPADS; and second, changed country conditions in Congo meant that Mapouya could not establish a well-founded fear of persecution.

The IJ also concluded that Mapouya was not eligible for withholding of removal. The IJ found that Mapouya had not shown that it was more likely than not that he would be persecuted on account of one of the five protected grounds if he returned to Congo. Finally, the IJ found that Mapouya did not present medical evidence to corroborate his claims that he was beaten for months, and therefore his claim under The Convention failed as well.

Mapouya appealed to the BIA, which affirmed the IJ's ruling and added further comments on the IJ's "changed country conditions" conclusion. Mapouya added a due process argument in his BIA appeal, citing the IJ's refusal to hear Viong's testimony first. He also submitted additional evidence in the form of Country Reports for Congo for 1997 and 2004. The BIA found no due process violation, reasoning that the IJ "conducted a full and fair hearing." Consequently, the BIA dismissed Mapouya's appeal in an order dated December 16, 2005. This appeal followed.

---

[6] According to an English translation which Mapouya submitted at his removal hearing, the UNHCR document states that Mapouya was registered in Gabon as an asylum seeker for purposes of attaining refugee status.

[7] Mapouya did not reunite with his wife and child in Gabon, as they had moved on to Mali prior to Mapouya's arrival in Gabon.

## II.    JURISDICTION

This Court has jurisdiction to review the final decision of the BIA pursuant to 8 U.S.C. § 1252(a)(1).

## III.    LAW AND ANALYSIS

### A.    Standard of Review

Where the BIA adopts the IJ's reasoning, the Court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (citing *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003)). In this case, the BIA summarily adopted the IJ's decision while adding a comment on the IJ's treatment of the rebuttable presumption/changed country conditions question. The BIA also made a finding on Mapouya's due process claim. The Court therefore directly reviews the decision of the IJ while considering the additional comment made by the BIA. *Id.* Because the due process claim was not before the IJ, the Court directly reviews the BIA's decision on that claim. *Id.*

Furthermore, the Supreme Court recently held that when the IJ (and, subsequently, the BIA) does not make the proper inquiry and legal conclusions, supported by legal analysis and reasoning, the "proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Gonzales v. Thomas*, 126 S.Ct. 1613, 1615 (2006) (per curiam) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2004) (per curiam)). The Court noted: "'A court of appeals 'is generally not empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.'" *Id.* (quoting *Ventura*, 537 U.S. at 16) (in turn quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). In one of the two Sixth Circuit opinions citing *Thomas*, the Court explained that "where, as here, a reviewing court cannot sustain an agency decision because the agency has failed to consider a legal issue central to resolution of the petitioner's claims, the appropriate remedy is remand to the agency for further consideration." *Xin Mao Wu v. Gonzales*, No. 05-3939, 2007 U.S. App. LEXIS 1833, 7-8 (6th Cir. January 26, 2007).

The Supreme Court's *Thomas* language is especially vexing in light of the review standards previously (and, arguably, still) applicable. When the Court reviews the IJ's "application of legal principles to undisputed facts, rather than its underlying determination of those facts or its interpretation of its governing statutes, the review of both the [IJ's] asylum and withholding of deportation determinations is *de novo*." *Dorosh v. Ashcroft*, 398 F.3d 379, 381 (6th Cir. 2004) (quoting *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir. 2000) (internal quotations omitted)). *See also*, *Bleta v. Gonzales*, 174 Fed. App. 287, 291 (6th Cir. 2006) ("The immigration judge's legal conclusions are reviewed *de novo* and its factual findings for substantial evidence.") (citing *Tapucu v. Gonzales*, 399 F.3d 736 (6th Cir. 2005)).

By contrast, the Court reviews the IJ's factual findings under the "substantial evidence" standard. *See Filipi v. Gonzales*, 127 Fed. Appx. 848, 850 (6th Cir. 2005). An appellate court will reverse where the evidence in the record "not only supports a contrary conclusion, but indeed compels it." *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (quotation marks omitted). In other words, for reviewing the IJ's factual conclusions, "the test is not whether this Court might have decided differently but whether this Court is compelled to conclude that the [IJ] erred." *Dorosh*, 398 F.3d at 383.

Whether the IJ actually *made* a legal conclusion or a factual determination for the Court of Appeals to review appears to be the critical underlying issue in reconciling the Supreme Court's *Thomas* holding with the other review standards listed above.

Finally, claims of due process violations in deportation proceedings are reviewed *de novo*. *Gilaj*, 408 F.3d at 290 (citing *Mikhailevitch*, 146 F.3d at 391).

## B. Petitioner's Asylum Application

Mapouya requested asylum relief pursuant to 8 U.S.C. § 1158(b)(1), a section of the Immigration and Nationality Act (hereinafter "INA"). The IJ, acting on behalf of the Attorney General, has discretionary authority to grant asylum to those applicants who qualify as "refugees." *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007). Resolution of a request for asylum, therefore, involves a two-step inquiry: first, whether the petitioner is a "refugee" under § 1101(a)(42)(A),[8] and second, whether the petitioner merits a favorable exercise of discretion by the IJ. *Id.* (citing *Ouda v. INA*, 324, F.3d 445, 451 (6th Cir. 2003) (internal quotation marks and citations omitted)); *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (quoting *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994)).

The burden falls on the applicant to show that he or she meets the definition of "refugee." *See Mikhailevitch*, 146 F.3d at 389. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. *See id.* (citing 8 C.F.R. § 208.13(a)); *see also*, *Cutaj v. Gonzales*, No. 05-4600, 2006 U.S. App. LEXIS 28473, *10 (6th Cir. November 15, 2006). Accordingly, a credibility determination forms the initial consideration in an IJ's asylum claims analysis.[9] *See Begu v. Gonzales*, 162 Fed. Appx. 425, 427 (6th Cir. 2006) (citing *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004)). Here, the government argues that credibility is not an issue before the Court because the IJ found that even if Mapouya were credible, he could not meet his burden of proof. Because we believe that the conclusion that Mapouya was not credible permeates the IJ's analysis, we address the IJ's adverse credibility determination at the outset.

### 1. Credibility

Contrary to the IJ's assertion,[10] an adverse credibility determination is treated as a finding or conclusion of fact, and is therefore subjected to review under the "substantial evidence" standard. *See, e.g.*, *Begu*, 162 Fed. Appx. at 427 (citing *Yu*, 364 F.3d at 703). The finding, however, "must be supported by specific reasons." *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005) (quoting *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004)). Moreover, those specific reasons must "bear a legitimate nexus to the finding." *Sylla*, 388 F.3d at 926. Importantly, "an adverse credibility finding must be based on issues that go to the heart of the applicant's claim," and cannot be based on irrelevant inconsistencies. *Liti*, 411 F.3d at 637 (quoting *Sylla*, 388 F.3d at 926). In other words, "if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Duan Ying Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (citing *Sylla*, 388 F.3d at 925). "Moreover, 'speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence.'" *Liti*, 411 F.3d at 637 (quoting *Shire v. Ashcroft*, 388 F.3d 1288, 1296 (9th Cir. 2004)). The Sixth Circuit has reversed the credibility determination when it "is based on inconsistencies unsupported in the record." *Id.* (citing *Sylla*, 388 F.3d at 930; *Ileana v. INS*, 106 Fed. Appx. 349, 351-52 (6th Cir. 2004)).

---

[8] 8 U.S.C. § 1101(a)(42)(A) defines "refugee" as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

[9] This statement is not to be confused with the two-step asylum inquiry itself.

[10] The IJ classified his adverse credibility finding as a "Conclusion of Law."

The IJ's order cited three primary inconsistencies as the basis for his adverse credibility finding.[11]  Based on the analysis that follows, we conclude that the IJ focused on irrelevant (and arguably nonexistent) discrepancies and inconsistencies unsupported by the record as the basis for his adverse credibility finding.

### a. "Fighter"

First, the IJ clearly placed tremendous importance on a potential inconsistency between Mapouya's 589 form[12] and Mapouya's testimony involving why Sassou-Nguesso's forces detained Mapouya.  The person translating and transcribing Mapouya's application wrote that Mapouya was detained the second time after the government forces accused him of being a "fighter" and supporting Pascal Lissouba.  The transcriber also used the same word earlier in the application to describe Mapouya's arrests.  During his cross-examination at the hearing, however, Mapouya testified vehemently that he was not a "fighter," and that he was not accused of being a "fighter."  Mapouya testified on redirect that he could neither read nor write English, that he told the transcriber that he had been a Lissouba supporter and that Lissouba's party had worked against "the government" (i.e. Sassou-Nguesso's forces).  Mapouya also testified that he never said anything to the transcriber about taking up arms against the government or being accused of doing so.  Additionally, Viong testified that Mapouya was arrested for "supporting the Lari people."[13]

Notwithstanding Mapouya's attempts to clarify what was most likely a translation misunderstanding, the IJ found this apparent inconsistency very significant.  The IJ explained that "there is quite a difference between being a fighter and being a simple supporter."  The IJ then made the unsubstantiated assumption that Mapouya "us[ed] the word 'fighter' in this context to mean someone who had taken up arms either against Sassou Nguesso [sic] . . . or in favor of Lissouba."  Essentially, the IJ relied on the general record evidence that civil war was raging in the Congo in 1997-98 to *assume* that Mapouya was really accused of being a militia member fighting against Sassou-Nguesso.  Based on this assumption, the IJ concluded that "[t]his is not a minor inconsistency but does change very substantially the thrust of [Mapouya's] application."

At least two critical problems arise from the IJ's treatment of this alleged inconsistency, however.  First, the IJ subsequently offered no reasoned analysis of *why* the difference in terms "changes substantially" Mapouya's application.[14]  Second, and perhaps even more compelling, this alleged inconsistency is unsupported by the record evidence; the IJ had to impute meaning to a word that was most likely the result of an erroneous  translation, and he drew that meaning by "speculation and conjecture" based on general evidence of warfare in Congo at the time.  The IJ's conclusion that Mapouya used the word "fighter" in the militaristic meaning on his application was not based on any specific record evidence that Mapouya took up arms against Sassou-Neguesso, or that Mapouya was ever accused of doing so.  Indeed, it directly contradicts what the IJ described as

---

[11] The IJ also described Mapouya's 589 form as "very brief."  As we have explained, however, "the failure of an applicant to provide an exhaustive list of details in his original asylum application does not amount to an inconsistency warranting an adverse credibility finding."  *See Ben Hamida*, 478 F.3d at 739.

[12] The official Application for Asylum and for Withholding of Removal paperwork is designated Form I-589.

[13] Again, Viong's testimony was simply a recounting of Mapouya's story as Mapouya had previously described to Viong.

[14] The IJ's next sentence reads as follows: "It is one thing to say that one was accused of taking up arms against a rival militia and another thing to say that one quietly worked and was quietly militant for the rights of the Lari people even though he was Mbochi."  Perhaps the IJ meant that Mapouya could not prove persecution "on account of" political opinion if he was detained because of being a militiaman, but the IJ did not offer that reasoned analysis.

Mapouya's "vehement" denial that he fought militarily.[15] The IJ's unsubstantiated assumptions are not sufficient to support an adverse credibility determination.

### b.  Whose house was burned

Second, the IJ relied on an alleged inconsistency between Mapouya's testimony and his 589 form involving a house that Sassou-Nguesso's forces burned down. Mapouya stated on his 589 form that he returned home from prison after the second arrest "to find that the house I owned was burned." Then, during his direct hearing testimony, Mapouya testified that the house his parents had lived in was the house that was burned, and that the house in which Mapouya, his wife, and child formerly lived was unharmed. The IJ cited this alleged inconsistency as one of the three grounds for finding Mapouya incredible, despite Mapouya's subsequent clarification on cross-examination and redirect. The IJ's reliance on this alleged inconsistency is erroneous, however, for two reasons.

First and most importantly, the alleged inconsistency does not go to the heart of Mapouya's asylum application because it is irrelevant to Mapouya's well-founded fear of persecution and torture in the future if he returns to Congo. Therefore, the alleged inconsistency is an insufficient ground upon which to base an adverse credibility finding under *Liti* and *Sylla*, as outlined previously.

Second, a closer reading of the 589 form juxtaposed with Mapouya's testimony reveals that there was no inconsistency at all, merely the IJ's frustrated misunderstanding and likely another translation problem. Mapouya tried to explain during the cross-examination that he owned by inheritance the house in which his parents formerly lived, and that it was this house the military forces burned down, not the house in which Mapouya himself lived. Mapouya's attempted explanation, however, "only further confuse[d]" the IJ. On redirect Mapouya's testimony further clarified the ownership situation such that an objective observer should have been confused no longer. Mapouya explained that his father died in 1982, that his mother died in 1996, and that after his parents died, he became the owner of the house in which his parents had lived while they were alive, i.e. he took legal title to the property. According to Mapouya's testimony, this was the house that was burned.

Clearly, in light of the fact that Mapouya owned two houses, one of which was burned, there was great potential for translation problems on his 589 form; the English language provides myriad ways to state the possessive, all of which may not translate directly from another language but which have dramatically different connotations once translated, e.g. "ours, theirs, mine, his, hers," etc. The same problem applies to the numerous ways in which the English language can connote ownership of a dwelling, e.g. "own, have, possess, live, legal ownership, equitable ownership," etc. But even if translator error can plausibly lie at the heart of the supposed inconsistency, the plain language on the 589 form does not create an inconsistency with Mapouya's testimony at all; the uncontroverted evidence is that Mapouya did, in fact, legally own the house that was burned, even if the house formerly belonged to his now-deceased parents.

Moreover, specific testimony later in the hearing reveals the IJ's misunderstanding of the ownership situation. After Mapouya testified on direct, the government's attorney pounced on cross-examination and successfully framed any difference between Mapouya's testimony and his

---

[15] Importantly, Mapouya, unable to read or write in English, had no way of verifying the precise words the interpreter used on the 589 form. Further, the point made at trial by Mapouya's attorney is well taken here; "fighter" has many meanings, and based on Mapouya's testimony, the facts compel a conclusion that the use of the word "fighter" on the 589 form was no more than a communication and interpretation error between Mapouya, his translator, and the 589 form.

589 form's contents as a major discrepancy. The IJ readily adopted the government's position, even taking over the cross-examination at one point. Unfortunately, the IJ only further contributed to the confusion by misquoting the statements on the 589 form during his questions to Mapouya. Specifically, the IJ exclaimed: "Sir, listen. Listen! I'm quoting from your application. Your application doesn't say anything about your parents' house being burned. It says I was released from prison to find that my house, the house that I owned, was burned. Is that true?" The wording of the IJ's obviously frustrated questioning is illustrative; the IJ conflated the descriptive phrases "my house" (which was *not* the language in the 589 form) and "the house that I owned" (the language actually used). The IJ treated the phrases as having exactly the same meaning, despite the obviously critical differences between the two. Mapouya used the second phrase on his 589 form, but not the first. Considering the full context of Mapouya's testimony, there is no inconsistency, material or otherwise. Accordingly, the IJ's adverse credibility determination, to the extent that conclusion was based on the alleged "burned house" inconsistency, is not supported by substantial evidence.

### c. Viong's testimony

Third, the IJ cited a single discrepancy between Mapouya's testimony on direct and the testimony given by his witness, Ibrahima Viong, to support the adverse credibility determination. The IJ found it significant that Mapouya testified that he left the Congo for Gabon, whereas Viong testified that Mapouya had told Viong that he (Mapouya) went to Mali.[16] Notwithstanding this inconsequential detail's irrelevance to the heart of Mapouya's asylum claim, the IJ relied on the discrepancy as the third basis for finding Mapouya incredible.

Curiously, we note that the IJ himself characterized his third basis as "not quite as serious" as the previous two bases discussed above. Moreover, the IJ even noted the very evidence that undermines his acceptance of Viong's testimony as the truthful version; the UNHCR refugee document. The IJ, however, did not just "note" the evidence that corroborated Mapouya's testimony; rather, he flatly ignored it.

The corroborating evidence Mapouya offered compels the conclusion that Viong simply confused the location of Mapouya's wife and child (Mali) with the country to which Mapouya fled (Gabon). The UNHCR document definitively supports Mapouya's story; he testified that he finally entered Gabon successfully in September of 1999, and the UNHCR document states that the attestation was issued in Gabon on September 21, 1999, expiring on September 20, 2000. Accordingly, the IJ erred in basing his adverse credibility determination, in part, on the discrepancy between Mapouya's testimony and Viong's testimony.[17]

---

[16] According to Mapouya's 589 form and his oral testimony, Mapouya left Congo and went to Gabon, while his wife and child went from Congo to Gabon, and then to Mali. Mapouya argued that Viong was simply mistaken. The IJ was "not quite so sure" that it was Viong who was mistaken.

[17] The hearing transcript and the IJ's summary thereof notably reveals additional places where the IJ apparently thought Mapouya's testimony was inconsistent with itself, or inconsistent with his application. The IJ's order does not formally cite these instances in support of the IJ's adverse credibility finding, but they illuminate the IJ's premature and unfounded adverse credibility finding against Mapouya.

First, the IJ "did not fully understand" Mapouya's testimony about returning home after his second arrest to be "surprised" that the house was empty and his family was gone. Similarly, the IJ seemed incredulous at the usage of the terms "brother" and "friend" in the letters Mapouya provided as corroboration, revealing his ethnocentric ignorance in an exchange documented on the record. Moreover, the IJ found it "remarkable" that Yangari arranged for Mapouya's family to flee the country but failed to make similar arrangements for his own family, apparently disregarding Mapouya's testimony that Yangari made the arrangements at Mapouya's affirmative request. A final example is found in the IJ's language describing Mapouya's testimony about entering Gabon. The IJ apparently did not understand how it might take Mapouya several months to enter Gabon from neighboring Congo, despite Mapouya's testimony to the effect that he and numerous others similarly fleeing Congo had to cross the border surreptitiously, hid from Gabonese border guards in

In sum, because the alleged discrepancies advanced by the IJ "'cannot be viewed as attempts by [Mapouya] to enhance his claims of persecution, they have no bearing on credibility.'" *Begu*, 162 Fed. Appx. at 429 (citing *Sylla*, 388 F.3d at 926). The IJ provided no legal analysis or reasoning to explain why the alleged inconsistencies he cited are material to Mapouya's asylum claim. Furthermore, the alleged discrepancies cited by the IJ do not constitute substantial evidentiary support for a negative credibility finding.

### d. The Result of the Erroneous Adverse Credibility Determination

Consequently, we must analyze the effects of the IJ's erroneous adverse credibility determination. As explained previously, the first step in an IJ's evaluation of an asylum application is the credibility determination. *Begu*, 162 Fed. Appx. at 427 (citing *Yu*, 364 F.3d at 703). We conclude that the IJ's erroneous adverse credibility determination permeated and infected the IJ's subsequent factual findings and legal conclusions as to whether Mapouya could meet his burden on the question of persecution for the asylum and withholding of removal claims, as well as his claim under The Convention.[18]

For example, the letters Mapouya presented strongly corroborated his fear of future persecution and torture, but the IJ failed to acknowledge the letters in his final order. One letter attests to the fact that the rival factions of Sassou-Nguesso and Lissouba continue to persecute their (political) opposition, especially on ethnic grounds. The other letter chillingly states that Sassou-Nguesso's forces are "still looking for you in the Congo" and that Mapouya's "name is on the wanted list at the Ministry of the Interior" as witnessed personally by the letter's author. During the hearing, the IJ focused only on trying to understand how Mapouya could refer to one of the letter writers as his "brother" when the men are not blood relatives. What should have been a simple concept to understand (using "my brother" as a salutation conveying great affection rather than blood relation) became the issue, based on the IJ's distrust of Mapouya, not the letters' contents and implications. We decline, however, to make an affirmative credibility finding of our own, because immigration cases are, by nature, so fact-driven. Instead, the Court instructs that the case be remanded, and we urge that a different IJ to make his or her own credibility determination about Mapouya's relief requests. We note that even if we were to make a favorable credibility determination on the instant review, we would still be precluded, under *Ventura* and *Thomas*, from ultimately deciding whether to grant Mapouya's asylum claim; the IJ's ultimate conclusion on the asylum question reached only the first prong of the two-part "eligible-deserving"asylum analysis. *See, e.g.*, *Ben Hamida*, 478 F.3d at 736; *Chen*, 447 F.3d at 472. The IJ found that Mapouya was not *eligible* for asylum, but neither analyzed nor answered the second question of whether Mapouya *deserved* asylum. The latter question is, therefore, a matter of first instance appropriately decided by the IJ and BIA. The IJ must make the proper legal inquiries and conclusions on Mapouya's asylum request after "additional investigation or explanation," *Thomas*, 126 S.Ct. at 1615, and, accordingly, his or her own credibility determination.

---

the bush, and made numerous attempts until ultimately successful. The description does not sound markedly different than the circumstances by which some people illegally enter the United States, yet the IJ could not comprehend how it took several months for Mapouya to cross a single common border.

While the IJ's final order does not specifically base his adverse credibility determination on these issues, they shed light on the IJ's personal views toward Mapouya which, we believe, permeated his final decision, even if not officially cited. Moreover, these examples (and what they demonstrate) provide ample support for our suggestion that this case be given to a different IJ on remand.

[18] Notably, the IJ failed to address the ramifications of Mapouya's unique ethnic and political duality vis a vis future persecution and/or torture under the Sassou-Nguesso regime.

## 2. The Well-Founded Fear of Persecution and Changed Country Conditions

After making his adverse credibility determination, the IJ found that even if Mapouya was credible, he has "not shown that he has a well-founded fear of persecution in light of the changed circumstances in his country." [19] The BIA, addressing only the rebuttable presumption evidence, elaborated on the IJ's conclusion. The BIA reasoned that "even if the respondent testified credibly and established past persecution, the record contains evidence sufficient to rebut the presumption that the respondent's life or freedom would be threatened in the future." Specifically, the BIA cited specific passages from the Country Reports that allegedly demonstrated that Mapouya "no longer has a well-founded fear of future persecution." [20]

The BIA's decision is in error, however. The reasoning in the IJ's and BIA's respective opinions fails to consider the additional, corroborating evidence Mapouya provided that tends to show he still faces an individualized threat of future persecution, notwithstanding the changed country conditions described in the Country Reports.

An applicant can establish the persecution element in an asylum application by two alternative methods: (1) prove that he or she has suffered past persecution, or (2) show that he or she has a well-founded fear of future persecution. *Gilaj*, 408 F.3d at 283. *See also Mikhailevitch*, 146 F.3d at 389 (citing 8 C.F.R. § 208.13(a)-(b)); *Filipi*, 127 Fed. Appx. at 851 (the applicant "has two options" in trying to show persecution). Under the first option, an applicant "may prove that 'he or she has suffered persecution *in the past*,' at which point there is a presumption of a well-founded fear of future persecution." *Filipi*, 127 Fed. Appx. at 852 (quoting 8 C.F.R. § 208.13(b)(1)) (emphasis added). Under the other option, "the applicant may show that he or she has a well-founded fear of *future* persecution, 8 C.F.R. § 208.13(b)(2), which 'must be both subjectively genuine and objectively reasonable.'" *Id.* (quoting *Mikhailevitch*, 146 F.3d at 389) (emphasis added). The Sixth Circuit has held that an applicant "'cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution.'" *Mateo v. Gonzales*, 2007 U.S. App. LEXIS 3602, *25 (6th Cir. 2007) (citing *Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004) (citations omitted)).

If past persecution raises the rebuttable presumption, the government "may rebut that presumption by showing that conditions in the applicant's country have changed so 'that the applicant no longer has a well-founded fear of persecution.'" *Filipi*, 127 Fed. Appx. at 852 (quoting 8 C.F.R. § 208.13(b)(1)(i)(A)). However, "[t]he INS must do more than show that circumstances in the country have fundamentally changed; the INS must also show that such change negates the particular applicant's well-founded fear of future persecution." *Mateo*, 2007 U.S. App. LEXIS 3602 at *13 (citing *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003)). If the government rebuts the presumption, the applicant "must demonstrate a well-founded fear of future persecution notwithstanding" the changed country conditions. *Liti*, 411 F.3d at 639.

---

[19] The BIA stated "we find it unnecessary to address credibility."

[20] The BIA's opinion recounts the evidence as follows:

The record reveals that since the respondent's departure from his country, the respondent's political party has become a major party (Exh. 4 at 8). Opposition party officials willing to cooperate with the Government or to oppose it nonviolently remained in the country (Exh. 4 at 8). In addition, members of groups that opposed the government during the war have been permitted to return to their former government jobs (Exh. 4 at 9). On appeal, the respondent has not demonstrated error in the Immigration's Judge's conclusion that country conditions *for members of the respondent's political party* have materially changed.

J.A. 2 (emphasis added).

For guidance in this case, the *Liti* opinion is instructive. In *Liti*, the majority ultimately concluded that the BIA "erred in affirming the IJ's adverse credibility determination." *Liti*, 411 F.3d at 637. It then turned to the issue of changed country conditions, noting that "to establish their asylum claim, the Litis must demonstrate a well-founded fear of future persecution notwithstanding the political change which has occurred in Albania since they left in 1990." *Id.* at 639. This the Litis failed to do because the only evidence they provided to rebut the changed country conditions was their *own* testimony – to which the majority stated that "even if the applicant is credible, the absence of reasonably available corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof." *Id.* at 640 (quotation marks and brackets omitted). The majority indicated that the result would have been different had the Litis provided corroborating evidence to refute the Country Reports in their individual case. *Id.* ("Without such evidence, we agree with the BIA that in light of the fundamentally changed conditions in Albania, the Litis failed to satisfy their burden of demonstrating a well-founded fear of future persecution if *they* were to return.") (emphasis added).

Similar reasoning can be found in other Sixth Circuit cases. See, e.g., *Daneshvar v. Ashcroft*, 355 F.3d 615, 625 (6th Cir. 2004) (denying asylum based on evidence of changed country conditions in Iran when petitioner "has presented no credible evidence that he will be singled out for different treatment if he is deported back to Iran."); *Cacani v. Gonzales*, 188 Fed. Appx. 444, 446-47 (6th Cir. 2006) (denying review of asylum petition because generalized evidence offered to rebut changed country conditions evidence did "not demonstrate that [petitioner] would face the requisite individualized threat of harm.")

Here, the situation is somewhat different than *Liti*, because Mapouya presented corroborating evidence not from his own mouth, but from two independent sources in Africa, and that corroborating evidence shows an individualized threat of harm to Mapouya. Indeed, in *Liti*, the majority faulted petitioners for not getting corroborating evidence from "family members still living in Albania," *Liti*, 411 F.3d at 640, who presumably could have provided affidavits of "on the ground" conditions in Albania to refute State Department reports of changed country conditions. In Mapouya's case, perhaps the letters were properly discredited for some reason, but this does not appear anywhere in either the IJ's or BIA's discussion of changed country conditions. Even if the government can prove that country conditions in Congo have changed since 1997, the government must also show by a preponderance of the evidence that such change negates Mapouya's *individualized* well-founded fear of persecution. The letters, which specifically inform that ethno-political violence continues notwithstanding the Country Reports' generalized description, and that Mapouya is a wanted man in the government's eyes, needed to be carefully weighed against the Country Reports in order for a proper decision to have been made. Therefore the BIA's decision is not supported by substantial evidence, and the BIA or IJ on remand must carefully weigh Mapouya's corroborating evidence against the Country Reports.

## C. Petitioner's Withholding of Removal Application

Mapouya also requested withholding of removal pursuant to § 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3).[21] Unlike a discretionary asylum grant, withholding of removal is mandatory if the applicant can establish a clear probability of future persecution. *Khora v. Gonzales*, 172 Fed. Appx. 634, 640 (6th Cir. 2006) (citing 8 U.S.C. § 1231(b)(3); *INS v. Stevic*, 467 U.S. 407, 413 (1984)). A "clear probability" has been defined as more than a 50 percent likelihood of persecution. *Stevic*, 467 U.S. at 413. The administrative findings of fact on a withholding application "are conclusive

---

[21] Section 241(b)(3) provides that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."

unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

Here, the IJ concluded that Mapouya was not entitled to withholding of removal, but provided no legal analysis or reasoning for his conclusion.[22] Although "an applicant who fails to meet the statutory eligibility requirements for asylum must necessarily fail to meet the requirements for withholding of removal," *Ben Hamida*, 478 F.3d at 741 (citing *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005)), the IJ failed to cite even this well-settled proposition to support his withholding conclusion. As a corollary, the IJ's erroneous adverse credibility finding also underlies his withholding of removal denial. Therefore the BIA or IJ hearing the case on remand must also analyze Mapouya's withholding of removal claim after making a proper credibility determination.

### D. Petitioner's Application for Relief
### Pursuant to the Conventions Against Torture

Mapouya also petitions for review of the denial of his Convention relief claim. To establish entitlement to such relief, an applicant must prove "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Singh v. Ashcroft*, 398 F.3d 396, 404 (6th Cir. 2005) (citing *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004) (in turn quoting 8 C.F.R. § 208.16(c)(2))). A claim under The Convention involves a "separate question of the threat of torture without regard to the enumerated ground for asylum." *Karomi*, 168 Fed. Appx. at 729. *See also Ben Hamida*, 478 F.3d at 741 ("An applicant seeking relief under [The Convention] does not need to show that torture will occur on account of one of the five statutory grounds listed [in the INA]"). "It is possible, therefore, for an applicant for asylum to succeed on a [Convention] claim even though a withholding of removal claim under the INA is denied." *Karomi*, 168 Fed. Appx. at 729 (citing *Singh*, 398 F.3d at 405) (in turn citing *Castellano-Chacon v. INS*, 341 F.3d 533, 551-52 (6th Cir. 2003) (explaining that an application for withholding of removal under the INA differs from one filed under The Convention because the latter focuses on a "particularized threat of torture" without requiring a linkage to one of the five protected grounds)).

To assess the risk of torture, the adjudicator must consider the possibility of future torture, including (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant can relocate to a part of the country of removal where he is not likely to be tortured; (3) evidence of gross, flagrant, or mass violations of human rights within the country of removal; and (4) other relevant information regarding conditions in the country of removal. *Ali v. Reno*, 237 F.3d 591, 596-97 (6th Cir. 2001). *See also Singh*, 398 F.3d at 405; *Karomi*, 168 Fed. Appx. at 728.

In Mapouya's case, the IJ only briefly addressed his claim under The Convention, stating simply that "the evidence falls well short of a grant under that section of law." The IJ based this conclusion on the fact that Mapouya "testified that he was repeatedly beaten for months on end but brings forward no medical evidence and does not corroborate his claim in any meaningful way." We find the IJ's scant legal analysis and reasoning inadequate, however.

First, the IJ's adverse credibility determination on the asylum question erroneously infected his analysis of Mapouya's Convention claim. *See Ndiaye v. Gonzales*, 184 Fed. Appx. 458, 463 (6th Cir. 2006) (reversing and remanding on petitioner's claim under The Convention when IJ's denial of Convention relief was based entirely on his adverse credibility determination on petitioner's asylum and withholding of removal claims) (citing, *inter alia*, *Kamalthas v. INS*, 251 F.3d 1279, 1280 (9th Cir. 2001); *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000) (both stating "[w]e are not

---

[22] The extent of the IJ's analysis on Mapouya's withholding of removal claim is the following conclusory statement: "The respondent has not shown it is more likely than not that he would be persecuted on account of one of the five protected grounds and so the Court denies withholding."

comfortable with allowing a negative credibility determination in the asylum context to wash over the torture claim."); *Zubeda v. Ashcroft*, 333 F.3d 463, 479 (3d Cir. 2003) (finding error in the IJ's "allowing rulings on [petitioner's] asylum and withholding of deportation claim to control her claim under [The Convention]")).

Second, and to the extent that the IJ's order constitutes an additional Convention-specific adverse credibility finding, that (second) negative credibility determination is similarly unsupported by substantial evidence. Critically, "an alien's allegations of torture are not automatically incredible simply for failure to produce corroborating documentary evidence." *Singh*, 398 F.3d at 406 (citing 8 C.F.R. § 208.16(c)(2)). *See also Begu*, 162 Fed. Appx. at 429, n.2 ("The Court . . . specifically notes that Petitioner's failure to provide medical records related to the beatings [during her detention] does not constitute a reasonable basis for a finding of incredibility. . . . Not all beatings leave physical marks, and the inability of lay persons to identify such evidence alone is not sufficient to determine that the alleged acts never occurred.").

Third, the IJ did not analyze Mapouya's Convention claim through the lens of the four factors enumerated in *Ali* and outlined above.

Accordingly we also remand Mapouya's claim pursuant to The Convention as a matter of first instance under *Ventura* and *Thomas*.

## E.  Petitioner's Due Process Claim

Mapouya claims that he suffered a due process violation because the IJ refused to allow him to call Viong first. According to Mapouya's argument, the IJ's decision was prejudicial to his case because the IJ based the adverse credibility determination "on the basis of a perceived inconsistency in this case; the testimony of [Mapouya's] witness." Mapouya argues that the discrepancy on whether he fled to Mali or Gabon could have been rectified had the IJ allowed Mapouya to call Viong first. We find Mapouya's arguments unavailing.

Aliens are entitled to due process of law in deportation proceedings. *Gilaj*, 408 F.3d at 290 (citing *Denko*, 351 F.3d at 726) (in turn citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Due process requires that an alien be afforded a full and fair hearing. *Gilaj*, 408 F.3d at 290 (citing *Castellano-Chacon*, 341 F.3d at 553 (in turn citing *Mikhailevitch*, 146 F.3d at 391)). To prevail on a due process claim, a petitioner must demonstrate actual prejudice, and that the alleged prejudice materially affected the outcome of his or her case. *See Matter of Sibrun*, 18 I. & N. Dec. 354, 356-57 (BIA 1983).

While Mapouya may be able to establish prejudice from the IJ's decision (i.e. the discrepancy in testimonies was one factor the IJ cited for his adverse credibility finding, which in turn affected the IJ's ultimate holdings), Mapouya has not demonstrated that the outcome of his case would have been different if the IJ had allowed Viong to testify first. Importantly, the IJ hinged his adverse credibility determination on two additional factors unrelated to Viong's testimony and the Mali/Gabon discrepancy, as noted previously. The BIA determined that Mapouya failed to establish that the IJ's preferred order of witness testimony constituted a violation of his due process rights. We agree and affirm the BIA's decision on the due process claim. Our ultimate conclusion, however, renders Mapouya's due process claim moot.

## IV.   CONCLUSION

Upon review, we conclude that the IJ made an erroneous adverse credibility finding on the asylum question, and that this negative credibility determination permeates and infuses the IJ's subsequent findings and conclusions on Mapouya's additional requests for relief. Consequently, the IJ's order lacks adequate legal analysis and reasoning to support the ultimate conclusions contained therein. On remand, the agency (whether the BIA or an IJ) must rehear the case in its entirety and make the proper inquiries and legal conclusions to reach a credibility determination of its own, and then conduct the two-step asylum analysis. Similarly, the agency must make the proper inquiry and legal conclusions, supported by legal analysis and reasoning, on Mapouya's withholding of removal and Convention claims.

We urge that, on remand, a different immigration judge be assigned to any further proceedings. *See Cham v. Gonzales*, 445 F.3d 683, 694 (3d Cir. 2006) (citing *Sukwanputra v. Gonzales*, 434 F.3d 627, 638 (3d Cir. 2006) ("[W]hile we recognize that the assignment of an immigration judge is within the province of the Attorney General, if on remand an [immigration judge's] services are needed, we believe the parties would be far better served by the assignment to those proceedings of a different [immigration judge]." (quoting *Korytnyuk v. Ashcroft*, 396 F.3d 272, 287 n. 20 (3d Cir.2005)) (citations and internal quotation marks omitted)). *See also*, *Chen v. Gonzales*, 447 F.3d 468, 477 (6th Cir. 2006) ("[We remand] this matter to the BIA with directions to return the case to the immigration court, preferably before a different judge, for reconsideration and for any further proceedings that may be considered necessary and consistent with this opinion."); *Guchshenkov v. Ashcroft*, 366 F.3d 554, 560 (7th Cir. 2004) ("We urge that these two cases be reassigned to other immigration judges.").

Accordingly, we hereby **GRANT** the petition for review, **VACATE** the decisions and orders below, and **REMAND** to the BIA for reconsideration and for any further proceedings that may be considered necessary and consistent with this opinion.

———————

**DISSENT**

———————

CLAY, Circuit Judge, dissenting.  The Board of Immigration Appeals ("BIA") held that changed country conditions in the Republic of Congo rebutted any presumption of a well-founded fear of persecution on the part of Petitioner.  This conclusion is supported by substantial evidence and should be upheld.  Nevertheless, in order to find in favor of Petitioner, the majority unreasonably reads our precedents on changed country conditions, ignores the deferential standard of review, and embraces a theory of the evidence not argued by Petitioner or supported by the record.  While I am not without sympathy for Petitioner, my review of the record prevents me from joining the majority.  Accordingly, I respectfully dissent.

**I.**

The material facts of this case are simple and straightforward.  The BIA affirmed the judgment of the Immigration Judge ("IJ") on a single ground:  "[E]ven if [Petitioner] testified credibly and established past persecution, the record contains evidence sufficient to rebut the presumption that [Petitioner's] life or freedom would be threatened in the future."  J.A. at 2 (citing 8 C.F.R. §§ 1208.13(b)(1)(i) and 1208.16(b)(1)(i)).  The BIA reached this conclusion by relying on a report issued by the United States Department of State.  *See* U.S. Dep't of State, Country Reports on Human Rights Practices for the Republic of Congo (2004), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41598.htm ("2004 State Department Report").  The BIA reasoned that, in the time since Petitioner had left the Republic of Congo, his political party had become a major political party.  Furthermore, the BIA stated that opposition party officials willing to cooperate with the ruling Congolese government or oppose it nonviolently have remained in the country.  Additionally, the BIA noted that "members of groups that opposed the government during the war have been permitted to return to their former government jobs."  J.A. at 2 (citing 2004 State Department Report).  The BIA therefore concluded that Petitioner did not demonstrate error in the IJ's conclusion that country conditions for members of Petitioner's political party had changed to the extent that any presumption of a well-founded fear of persecution stemming from past persecution was rebutted by a preponderance of the evidence.

Petitioner did produce some evidence on the issue of changed country conditions, which can be briefly summarized.  Before the IJ, Petitioner submitted the 2003 State Department Report,[1] several articles published by Amnesty International,[2] and two letters from persons who reside in the Congo.  The first letter, written on August 10, 2003, was signed by Petitioner's "friend Mavoungou Alain."  J.A. at 186.  Alain "urge[d] [Petitioner] not to come back to the Congo" because "Sassou's group is still looking for you . . . . [Y]our name is on the wanted list at the Ministry of the Interior, I saw it with my own eyes."  J.A. at 186.  The letter continues that "Sassou's Cobras goes [sic] into people's homes, they imprison people, and with no judgment, others are condemned and killed. . . . [T]here is no peace in the Congo."  J.A. at 186.  The second letter, written on June 6, 2003, from

———

[1] U. S. Dep't of State, Country Reports on Human Rights Practices for the Republic of Congo (2003), *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27722.htm ("2003 State Department Report").

[2] Petitioner submitted the following documents:  Continuing Cycle of Violence in the Republic of Congo, The Wire-April 2003 Congo Amnesty International (2003), http://web.amnesty.org/web/wire.nsf/April2003print/Congo?OpenDocument; Republic of the Congo, Amnesty International Report 2003 (2003); Congo Brazzaville:  Impunity Perpetuates Human Rights Abuses and Instability, Amnesty International Press Release (Apr. 9, 2003), http://web.amnesty.org/library/print/ENGAFR220022003; Republic of Congo:  A Past that Haunts the Future (2003), http://web.amnesty.org/library/print/ENGAFR220012003.

Petitioner's "brother Van Loye," states that "rival fractions [sic] of Sassou N'Guesso and those of the former president Pascal Lissouba, up to now keep going into houses to arrest people; especially the ethnics of Larry [sic] which are like us." J.A. at 190.

## II.

The sole question that this Court must resolve is whether, on this record, substantial evidence supports the BIA's conclusion that changed country conditions rebutted Petitioner's presumption of a well-founded fear of persecution.[3] Petitioner conceded removability before the IJ, but applied for asylum, withholding of removal, and relief under the Convention Against Torture. In order for an applicant to be granted asylum, the applicant must (1) qualify as a "refugee" as defined in the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A), and (2) demonstrate that he "merits a favorable exercise of discretion by the Attorney General." *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998)). The Act defines "refugee" as:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

§ 1101(a)(42)(A); *see Mikhailevitch*, 146 F.3d at 389. The applicant initially bears the burden of establishing that he qualifies as a refugee under the Act. *Ramaj v. Gonzales*, 466 F.3d 520, 529 (6th Cir. 2006). If the applicant establishes that he suffered past persecution, as the BIA assumed in this case, that finding raises a rebuttable presumption that the applicant has a well-founded fear of future persecution. *Id.* "This presumption can be rebutted 'only though establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return.'" *Id.* (internal quotation marks omitted) (quoting *Mikhailevitch*, 146 F.3d at 389). It is not enough for the government to merely demonstrate that conditions in the applicant's country of origin have changed; instead, the changes must be "such that the applicant no longer has a well-founded fear of persecution." 8 C.F.R. § 208.13(b)(1)(i)(A).

Whether the government has rebutted the presumption of a well-founded fear of persecution by demonstrating changed country conditions is a question of fact that this Court reviews for substantial evidence supporting the BIA's decision. *See Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005). Under the deferential substantial evidence standard, administrative findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). In this case, the BIA's factual finding of changed country conditions should be upheld unless Petitioner can "show that the evidence he presented was so compelling that no reasonable factfinder could fail to find" that the government did not demonstrate changed country conditions by a preponderance of the evidence. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). The BIA's decision should be affirmed if, considering the record as a whole, its decision is "supported by reasonable, substantial, and probative evidence." *Id.* at 481.

---

[3] If Petitioner could not demonstrate a well-founded fear of persecution, he could also not demonstrate the "clear probability of persecution" required for a grant of withholding of removal, "which is a stricter standard than the 'well-founded fear' standard." *Ramaj v. Gonzales*, 466 F.3d 520, 531-32 (6th Cir. 2006) (quoting *Ali v. Ashcroft*, 366 F.3d 407, 411 (6th Cir. 2004)). Petitioner also cannot demonstrate that "he would more likely than not be subjected to torture after being deported," and therefore he cannot obtain relief under the Convention Against Torture. *Id.* (citing 8 C.F.R. § 1208.16(c)(2)).

Turning to the evidence in the record, it is clear that the BIA's decision is supported by substantial evidence. Petitioner's claim for asylum was based solely on political persecution. Petitioner claims that he was persecuted for supporting the minority Pan-African Union for Social Development party ("UPADS"). The most fundamental change in country conditions was perhaps so obvious that the BIA neglected to specifically mention it: In the period prior to the time Petitioner fled the Republic of Congo, the country became engulfed in a civil war, which has now ended. According to the 2004 State Department Report, politically motivated killings have stopped. *See* 2004 State Department Report ("There were no reports of political killings by the Government or its agents."). Moreover, "[t]here were no reports of politically motivated disappearances during the year." *Id.* Additionally, "there were no reports that security forces regularly harassed and extorted refugee returnees and residents in outlying areas." *Id.* Finally, the 2004 State Department Report supports the three findings relied upon by the BIA: That UPADS is a major political party, that opposition party officials willing to cooperate with the ruling Congolese government or oppose it nonviolently have remained in the country, and that members of groups that opposed the government during the war have been permitted to return to their former government jobs. *Id.* These facts, taken together, provide substantial evidence supporting the BIA's finding that changed country conditions rebutted the presumption that Petitioner had a well-founded fear of persecution.

Petitioner makes several arguments that, notwithstanding this evidence, the government has nevertheless failed to rebut the presumption of a well-founded fear of future persecution. Petitioner argues that Sassou-Nguesso (the leader who was in power when Petitioner left the Congo) remains in power, and that the judicial branch "continues to be subjected to political influence, bribery, and corruption."[4] Petitioner's Br. at 28. Petitioner also argues that "there are still reports of unlawful killings by government security forces, as well as documentation of their ability to beat and torture their own civilians with total impunity." Petitioner's Br. at 28. Petitioner contends that the Republic of Congo still has a poor human rights record,[5] that security forces killed civilians in the southern "Pool" region,[6] that the government committed various human rights abuses in the same region,[7] and that prison conditions continued to be harsh due to overcrowding. Petitioner also asserts that the government frequently arrested and detained its citizens,[8] and that supporters of the government included mostly people from northern ethnic groups.

None of these facts undercut the BIA's finding, supported by the 2004 State Department Report, that conditions have changed in the Republic of Congo such that a well-founded fear of *political* persecution is no longer reasonable. The BIA's factual findings support the conclusion that political persecution in the Republic of Congo has subsided. Although Sassou-Nguesso remains in power, the Republic of Congo experienced elections in 2002 which, while not free of problems, were

---

[4] *See* 2004 State Department Report ("The judiciary continued to be overburdened, underfunded, and subject to political influence, bribery, and corruption.").

[5] *See, e.g.*, 2003 State Department Report ("The Government's human rights record remained poor.").

[6] *See* 2003 State Department Report ("There were no reports of political killings; however, there were press reports that government forces killed civilians in the Pool region prior to the March signing of the Peace Accord between the Government and anti-government Ninja rebels.").

[7] *See, e.g.*, 2003 State Department Report ("Until March, there were reports that undisciplined government forces committed abuses such as summary executions, rape, looting, and other violent acts, primarily in the Pool region.").

[8] *See* 2003 State Department Report ("The Constitution prohibits arbitrary arrest and detention; however, security forces frequently committed such acts.").

determined by independent monitors "not to contradict the will of the people." J.A. at 14. The mere fact that Sassou-Nguesso has been elected to power does not imply that the government of the Republic of Congo will persecute its citizens on account of their political beliefs. The 2004 State Department Report suggests that such persecution is no longer taking place with any appreciable frequency. While Petitioner points to a multitude of unsavory facts about life in the Congo, these facts are insufficient to compel a rejection of the BIA's factual findings, absent a compelling showing that the government continues to subject its citizens to persecution because of their political beliefs. *See Daneshvar v. Ashcroft*, 355 F.3d 615, 625 (6th Cir. 2004) ("We understand that many Iranian citizens may live in fear of persecution by the Islamic regime. However, the statute requires them to either be members of a particular race, religion, nationality, or social group, or to have the fear based on a political opinion."). While Petitioner has produced some evidence of poor country conditions–that is, evidence of corrupt courts, abuses of power by the government security forces, and violations of human rights–he has failed to produce compelling evidence that these abuses have been employed to persecute persons on account of their political beliefs.

This case is similar to *Mayela v. Gonzales*, No. 04-4460, 200 F. App'x 582, 585 (6th Cir. 2006) (unpublished), where this Court held that the petitioner, Mayela, a citizen of the Republic of Congo, did not qualify for asylum because she could not establish a well-founded fear of persecution. The Court reasoned that Mayela's political party was a major political party according to the 2002 United States Department of State country report, that opposition parties had been able to campaign openly, hold rallies, and monitor elections, and that many senior political officials from the former government had returned to the Republic of Congo and resumed political activities without incident. *Id.* The Court concluded that, even though soldiers had allegedly done terrible things to Mayela, she could not show that the alleged abuses "were a political reprisal rather than wanton violence during a civil war." *Id.* The evidence relied upon by the BIA here is strikingly similar to the evidence that the *Mayela* court found persuasive, and it likewise rebuts any well-founded fear of political persecution on the part of Petitioner.

The majority does not rely upon Petitioner's arguments, but instead crafts a new theory of the evidence–a theory not relied upon by Petitioner–as to why the evidence cited by the BIA was insufficient to demonstrate that changed country conditions rebutted the presumption that Petitioner had a well-founded fear of persecution. In the majority's view, the case must be remanded because the BIA failed to specifically consider the letters sent to Petitioner from persons living in the Republic of Congo. According to the majority, the letters "specifically inform that ethno-political violence continues notwithstanding the Country Reports' generalized description, and that [Petitioner] is a wanted man in the government's eyes." Majority Op. at 12. The majority therefore concludes that a remand is necessary so that the letters can be "carefully weighed against the Country Reports in order for a proper decision to [be] made." Majority Op. at 12.

There are several problems with the majority's theory. The first problem is that the majority simply assumes that the BIA failed to consider the letters. The majority most likely makes this assumption because the BIA's opinion does not specifically mention the letters.[9] Of course, the majority does not and cannot point to any legal requirement that the BIA explicitly consider and reject on the record every piece of evidence adverse to its conclusion. Moreover, Petitioner did not mention the letters in his closing argument before the IJ, and he makes only passing reference to

---

[9] The BIA's opinion does not specifically mention any of Petitioner's evidence; it instead asserts that "[Petitioner] has not demonstrated error in the Immigration Judge's conclusion that country conditions for members of [Petitioner's] political party have materially changed." J.A. at 2.

them in his brief before this Court.[10]  While the record on appeal does not contain Petitioner's brief to the BIA, his failure to highlight the letters throughout the course of these proceedings strongly suggests that Petitioner did not argue before the BIA that the letters were his key evidence.  In light of these facts, the BIA's failure to analyze their significance on the record is wholly unremarkable.

The second problem with the majority's theory is that, as evidence, the letters are not terribly persuasive.  Between the two letters, the only statement which arguably supports an individualized fear on the part of Petitioner on account of his political beliefs is Alain's statement that "Sassou's group is still looking for you . . . your name is on the wanted list at the Ministry of the Interior, I saw it with my own eyes."  J.A. at 186.  This statement is devoid of any corroborating detail, (e.g., how it is that Alain saw "the wanted list," or what the people on the "wanted list" are wanted for), it was written several months after removal proceedings were initiated against Petitioner, and it does not state that Petitioner was wanted for his political beliefs.  Moreover, Alain's statement is undercut by the 2004 State Department Report's unrebutted assertion that "[t]here were no reports of politically motivated disappearances" in the previous year.  While these statements are not logically inconsistent, if low-level political supporters such as Petitioner were in fact on a "wanted list," it would be reasonable to expect that some politically motivated disappearances would have occurred and would have been reported.  The fact that such disappearances reportedly have not occurred undermines Petitioner's evidence.  In short, even reading the letters for all they are worth, the record at most contains evidence that points in opposite directions.  "[W]e may not reverse the Board simply because we disagree with its understanding of the facts."  *Hana v. Gonzales*, 400 F.3d 472, 475 (6th Cir. 2005) (citing *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001)).  Petitioner's challenge to the BIA's factual finding of changed country conditions is particularly unpersuasive because the letters conflict with a State Department report, which is "generally the best source of information on conditions in [a] foreign nation[]."  *Sterkaj v. Gonzales*, 439 F.3d 273, 276 (6th Cir. 2006) (quoting *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004)) (holding that the IJ's finding that the petitioner lacked credibility was supported by substantial evidence where the petitioner's account of political persecution was inconsistent with a State Department report).  The letters do not compel a factfinder to reject the conclusion that changed country conditions rebut Petitioner's presumed fear of future persecution.  *Yu*, 364 F.3d at 702.

The third problem with the majority's theory is that it is not supported by our case law.  The majority primarily relies on *Liti v. Gonzales*, 411 F.3d 631 (6th Cir. 2005), but this case fails to support the majority's conclusion.  *Liti* involved citizens of Albania who were seeking asylum.  411 F.3d at 635.  The government conceded past persecution, but argued that the collapse of the communist regime constituted changed country conditions rebutting the Litis' presumably well-founded fear of persecution.  *See id.* at 639.  The *Liti* court upheld the finding of changed country conditions on evidence analogous to the evidence produced by the government in this case; that is, although the Litis submitted evidence of "general civil disorder and lawlessness," the relevant State Department report stated that there were no confirmed cases of political killings or disappearances.  *Id.*  To contest this finding, the Litis presented evidence, in the form of their own testimony, that a fellow anti-communist protester was killed upon his return to Albania.  *Id.* at 640.  The IJ discounted this evidence because it was not corroborated, and the *Liti* court upheld this determination.  *Id.*

The majority considers *Liti* support for its conclusion, reasoning that Petitioner "presented corroborating evidence not from his own mouth, but from two independent sources in Africa, and that corroborating evidence shows an individualized threat of harm to [Petitioner]."  Majority Op.

---

[10]  In fact, Petitioner does not mention the letters in the section of his brief devoted to changed country conditions; he instead only cites the letters to challenge the IJ's finding that he did not meet his burden of proof because his corroborative evidence was insufficient.

at 12. This reading of *Liti* does not fit the facts of this case. Nothing in the letter from Van Loye speaks to an individualized fear on the part of Petitioner on account of Petitioner's political beliefs; thus, the letter is immaterial to the issue considered in *Liti*. Furthermore, the problem with the evidence in *Liti* was not that it came from the Litis themselves. Instead, the evidence was problematic because no other facts in the record bolstered the veracity of the Litis' statements. *See Liti*, 411 F.3d at 640 (noting that the Litis failed to provide affidavits, newspaper articles, or a reasonable explanation for the absence of such corroborating evidence). In this case, the evidence is equally uncorroborated: The sole evidence that Petitioner is on a "wanted list" is the unsupported and undetailed statement of an individual whose background is unknown, who is not "independent" of Petitioner (he is instead Petitioner's friend), and who wrote the letter shortly after the initiation of removal proceedings. Finally, *Liti* did not consider whether substantial evidence would have nevertheless supported the IJ's conclusion in the event that the Litis' evidence was credible, and therefore *Liti* does not justify the conclusion that substantial evidence fails to support the BIA's conclusion in the instant case.

In sum, substantial evidence supports the BIA's factual findings. Neither Petitioner nor the majority point to evidence in the record that undermines this conclusion. I would affirm the judgment of the BIA.

## III.

For the foregoing reasons, I respectfully dissent.