**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0170n.06
Filed: March 2, 2009

No. 08-3864

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

IBRAHIM BERETE
    *Petitioner-Appellant*,

              v.

ERIC H. HOLDER, JR.
    *Respondent-Appellee.*

_____

On Petition For Review
From an Order of the
Board of Immigration Appeals

Before: KENNEDY, NORRIS, and COLE, Circuit Judges.

**KENNEDY, J**. Ibrahim Berete petitions for review of the Board of Immigration Appeal's (BIA) order removing him to Sierra Leone. The Immigration Judge (IJ) concluded that Berete was not credible, so that he was ineligible for asylum and withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, and protection under the Convention Against Torture. With respect to asylum and withholding of removal, the IJ also concluded that the government's showing of changed country conditions sufficed to rebut any well-founded fear of persecution Berete may have had, supposing that it had been established. Berete appealed the decision which the BIA dismissed after agreeing with the IJ's credibility finding. Berete then filed a petition for review in this court of the BIA's denial of asylum.[1] For the following reasons, we deny the petition.

**BACKGROUND**

_____

[1]Berete does not appeal the BIA's denial of withholding of removal and protection under the Convention Against Torture.

Berete's removal hearing was held before an IJ on September 18, 2006. There, he testified to the following which provides the basis for his claim of past persecution.

Berete's father was in the diamond business in Sierra Leone. Berete had traveled with his father to Belgium and France where his father sold diamonds. As a successful businessman, Berete's father was friendly with the police chief as well as other high ranking officials. Many of these officials would come to Berete's home and his father's store. His father was known to support the government, run by Momoh, as part of All People's Congress (APC) rule. His family was prominent generally, because many people would visit their store. At the time of the April 11, 2000 incident upon which Berete relies to establish past persecution, Berete lived in Hanga, a suburb of Kenema, in Sierra Leone, with his father, his mother, his father's other wife, his siblings, and his own wife and children. The store was adjacent to Berete's family's home. Workers employed by Berete's father were also at the house on the day of the incident.

On April 11, 2000, Berete's father ran home from mosque, told the family that he had heard gunshots, and determined that the family needed to flee the city. Berete's entire family split up into three cars. Berete was in a car with his mother, his father, and his father's other wife. As they attempted to speed away, rebels shot out the tires of their car. The car flipped over. The car's steering wheel crushed Berete's father's chest. Berete sustained a broken leg.

Berete's father's wives pulled Berete's father from the wreckage, but he died. Meanwhile, the other two vehicles containing other members of Berete's family stopped nearby. At some point, Berete's 17-year-old sister got out of the car and was standing by the roadside, when two Land Rovers pulled up alongside and kidnaped Berete's sister against the protestations of the family. Berete's mother decided that she needed a cloth to cover up Berete's father's body. Berete's mother sent their driver back to the house to get the cloth. The driver retrieved the cloth, and upon his

return, he informed the family that rebels had broken into the home, were looting the place and setting it ablaze, and beating the workers around the place.

Berete managed to make contact with the Red Cross which took him and his family, including his mother, his mother's co-spouse, his wife, his children, and his siblings, to Port Loko in Sierra Leone about 200 miles from his hometown. They stayed there in a camp for a few weeks until they were attacked by persons who knew who their father was. The entire family decided to leave Port Loko and traveled to nearby Guinea. From Guinea, Berete boarded a boat to the United States.

Prior to his testimony at the removal hearing, Berete had filed, in April of 2001, an I-589 application for asylum and withholding of removal. On that application, he stated:

> On April/11/00 ruthless rebels attacked my family compound and maliciously killed my father and then they break into my room and beat me and leave me lying down in my own blood with my right leg broken. The thugs then raided our boutique that me and my father use to operate and took every thing that we owned and lived for. After this devastation, I had to leave my home town of Hangha and went to Guinea where I stayed and healed my broken leg and ruptured ribs. I will also provide you with a picture of my right leg which was broken during the incident.
>
> After all these incidents the rest of my family's whereabout is unknown to me. It is believed that the rebels took along with them not only money but two of my sisters and two of my brothers, beyond their wills. They could have taken me as well but because I was severely beaten, they thought I was going to die. At this point in my life, I will not even wish my dead body be sent to Sierra Leone.

About the reason for his past mistreatment, Berete wrote:

> Probably simply, because we owned a proinent business in the city of Hongha and they needed to loot our store and take our money to support their rebellious group.

Berete signed his name on the application as both the applicant and the preparer of the application.

An asylum officer interviewed Berete with regard to his application on October 18, 2001. In his referral assessment, the asylum officer wrote:

Applicant stated that he and his father owned a general store in the town of Hanga. Applicant stated that on April 20, 2000, unknown men, whom the applicant assumed were rebels, attacked the village and looted their store. Applicant stated that his family attempted to escape, but were stopped by the rebels. Applicant stated that the rebels killed his father and beat him. Applicant stated that he suffered a broken leg as a result of the beating. Applicant stated that after the attack, ECOMOG forces entered the area and transported him to a Red Cross facility in Guinea. Applicant stated that he remained in Guinea for 3 months until he was able to make arrangements to come to the United States.

Notes taken by the asylum officer at that time also became part of the record. In his notes, the asylum officer wrote:

Applicant stated on April 11, 2000 unidentified rebels came to his store/home and stole all their goods 6 AM and asked applicant's father for money. Applicant stated his family tried to escape in a car but the rebels began shooting. Applicant's father was killed. Applicant was severely beaten and left for dead. Applicant's wife sisters and brothers were taken. The applicant stated the same day he was rescued by ECOMOG troops and transported to the [unreadable] on the border of Guinea.

He also noted the following brief question and answer exchange:

Q: Why do you think you were attacked by unidentified rebels?
A: Because we were wealthy Mandingos. All [unreadable] Africa we are. Singled out.
Q: What do you think would happen to you if you returned to Sierra Leone?
A: I will be killed.
Q: Why would anyone want to kill you?
A: Because my father was wealthy.
Q: So you are not wealthy anymore?
A: That is correct.

Based on this conversation with Berete, the asylum officer concluded that Berete was not entitled to asylum because the rebels did not persecute him on account of a protected characteristic.

In August of 2002, Berete filed another I-589 application for asylum and withholding of removal, but this time the form was prepared by an attorney. He explained the reason for his past mistreatment identically to the first I-589 form. The story he detailed describing the way he suffered a broken leg was nearly identical.

On September 18, 2006, Berete appeared before an IJ in a removal proceeding and gave the story detailed above in which his leg was broken as a result of the car flipping over, not as a result of a beating. The IJ asked Berete to explain the discrepancies between the two stories, and he stated that a layman prepared the first application and the second application was based on the first. He explained further that the beatings described in the first I-589 application did not happen to him. The beatings did happen, but they happened to the workers and other people at and around the family compound. He suggested that his signals got crossed with the layperson who prepared the application who was neither a skilled translator nor a trained attorney. He said that the same layperson who prepared the first application also translated between him and the asylum officer. Berete testified that he never read the first I-589 application, and simply gave it to the lawyer who prepared the second I-589 application by copying the first without further consultation with Berete.

Because of the inconsistency, the IJ found Berete's testimony not to be credible. He stated the following as part of his oral decision:

> With respect to credibility, it is the opinion of the Court that the respondent's testimony in Court today is not credible. I base my credibility determination on the fact that the respondent on a key issue in this case presented inconsistent statements. The respondent in both of his I-589's and the second one was prepared by a lawyer stated that his father was killed and his leg was broken as a result of a beating when these individuals attacked his house. He also stated to the Asylum Officer that he had suffered a broken leg as a result of beatings when the rebels killed his father at the house. He did not mention that his leg was broken as a result of the automobile rolling over. It was in Court testimony he testified that he was fleeing with his father, his mother, his father's second wife when the tire was shot out and the car flipped over. His father got an injury to his chest based upon the steering wheel hitting his chest and that his leg was injured during that incident. Those were key matters with respect to the respondent's claim. It is the opinion of the Court based on those inconsistencies that the respondent's testimony is not credible.

The IJ continued to state:

> If some Appellate body should reverse my credibility determination, it would still be the opinion of the Court that the respondent has failed to meet his burden to prove

that he has a well-founded fear of persecution. Even if the respondent's testimony is to be believed that these individuals who, although he never identified them as rebels but they were people opposed to the government, attacked his home, this was a result of a civil war in Sierra Leone which is well documented. And general harsh conditions shared by many others in a country and the harm arising out of civil strife, does not amount to persecution within the meaning of the law. I will note today that the respondent initially to the Assessment Officer stated that his father owned a general store. In Court today, he testified his father was a prominent diamond dealer in which he had friends who were high profile individuals in the Momoh government. It is the opinion of the Court that again that is an inconsistency and there is no corroboration that the father was, in fact, a prominent diamond dealer. Also, I have taken into consideration the current State Department Report which states that Sierra Leone is a constitutional republic with a directly elected president, a unicameral legislature. In 2002, the devastating 11 year civil conflict officially ended and the government backed by a large United Nations peace keeping force asserted control over the whole country. Based upon that Report, it is the opinion of the Court that the Government has met their burden to prove there are changed circumstance sin Sierra Leone and that the civil war has ended. And, therefore, the respondent would have no fear of persecution.

The BIA affirmed the decision, writing:

We find no clear error in the Immigration Judge's finding that the respondent is not credible. The Immigration Judge supported his adverse credibility finding with specific reasons based on the record that go to the heart of the respondent's claims. In his decision, the Immigration Judge identified a material inconsistency between the respondent's testimony and his Application for Asylum and for Withholding of Removal (Form I-589), and his supplemental Form I-589. Specifically, the respondent testified that on April 11, 2000, his leg was injured and his father was killed when their car flipped over while they were fleeing from rebels, but he indicated in both of his Form I-589s that his leg was injured as a result of a beating by the rebels and that the rebels killed his father at their house. We find the respondent's explanation that his original Form I-589 was filled out by someone who was not an attorney is insufficient, especially given that his supplemental Form I-589 was filled out by an attorney and it contains the same information. Moreover, contrary to the respondent's assertion on appeal, we find that this inconsistency is not minor and that it goes to the heart of his claims. Because we agree with the Immigration Judge's adverse credibility finding for the abovementioned reasons, we need not address the other inconsistencies found by the Immigration Judge or the respondent's related arguments on appeal. Additionally, because we agree with the Immigration Judge's adverse credibility finding for the abovementioned reasons, we need not reach his findings regarding the respondent's failure to meet his burden of proof, even if he testified credibly, or the respondent's related arguments on appeal.

**ANALYSIS**

A successful asylum application requires two showings: (1) that the petitioner is a refugee pursuant to 8 U.S.C. § 1101(b)(42); and (2) that the petitioner merits a favorable exercise of discretion by the IJ. *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007). The applicant has the burden to show that he is a refugee, 8 U.S.C. § 1158(b)(1)(B), meeting a "reasonable possibility" standard, *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005), which he can sustain without corroboration if the fact finder determines that he is credible, 8 C.F.R. § 208.13(a). Refugee status requires the applicant to demonstrate either past persecution or a well-founded fear of future persecution, 8 C.F.R. § 208.13(b), grounded in either "race, religion, nationality, membership in a particular social group, or political opinion," *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008) (citing 8 U.S.C. § 1101(a)(42)). If the applicant establishes past persecution, he is entitled to the presumption of a well-founded fear of future persecution which the government may rebut by showing changed country conditions. *Mapouya*, 487 F.3d at 412 (citing 8 C.F.R. § 208.13(b)(1)). "If the government rebuts the presumption, the applicant must demonstrate a well-founded fear of future persecution notwithstanding the changed country conditions." *Id.* (quoting *Liti*, 411 F.3d at 639) (internal quotation marks omitted).

Berete largely only has his own testimony as to his persecution in Sierra Leone, and therefore, his credibility takes center stage because his testimony suffices to show persecution only if he is credible. *Ndrecaj v. Mukasey*, 522 F.3d 667, 674 (6th Cir. 2008) (citing 8 U.S.C. § 1158(b)(1)(B)(ii)). The IJ found that Berete was not credible, and the BIA did not find clear error in that determination. Moreover, the IJ found changed country conditions in Sierra Leone such that the government rebutted the presumption of future persecution assuming Berete's credibility on his past persecution. The BIA did not reach this issue because it determined that Berete's lack of

credibility sufficed to dismiss his appeal. The BIA also found Berete's explanation for the inconsistencies unpersuasive.

When "the BIA summarily affirms a portion of the decision of an IJ without an in-depth discussion of the relevant issues, we review the IJ's decision as the final agency decision." *Kaba v. Mukasey*, 546 F.3d 741, 747 (6th Cir. 2008) (quoting *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003)) (internal quotation marks omitted). As here, when the BIA adopts an IJ's decision while adding its own reasoning and layer of review, we review both the IJ decision and BIA decision. *See Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005).

We review findings of fact under the substantial evidence standard. *Id.* Credibility is a finding of fact. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Changed country conditions is a question of fact as well. *Mapouya*, 487 F.3d at 418 (citing *Liti*, 411 F.3d at 639). Substantial evidence requires the findings of fact to "be supported by reasonable, substantial evidence in the record." *Shah v. INS*, 220 F.3d 1062, 1067 (9th Cir. 2000). The standard is deferential, but it still requires conclusions to be supported by specific reasons that go to the heart of the applicant's claim. *Kaba*, 546 F.3d at 748-49 (citing *Sylla*, 388 F.3d at 925-26) (internal quotation marks omitted). The law of the Circuit is well-established that "if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* (quoting *Sylla*, 388 F.3d at 926) (internal quotation marks omitted); *see also Koulibaly v. Mukasey*, 541 F.3d 613, 620 (6th Cir. 2008); *Mapouya*, 487 F.3d at 407; *Ramaj v. Gonzales*, 466 F.3d 520, 527-28 (6th Cir. 2006).

A. Credibility

Berete argues that: (1) discrepancies existed but they did not go to the heart of his claim; and (2) the IJ did not adequately address his explanation for the discrepancies.

Berete is correct to call into question the conclusion that the differences between his two stories–one injury by car accident while fleeing and another injury by beating at his home–represented his attempt to enhance his claim of persecution. In both stories, his leg was broken, his father died, their home was destroyed, and the family had to flee. Therefore, Berete argues, the court should turn its attention to his explanation for the discrepancy, and either credit or discredit that.

However, the IJ pointed out an additional discrepancy that did represent an attempt by Berete to enhance his claim. On his I-589 application forms and in the interview with the asylum officer, Berete only stated that his family had money and that his father ran a general store. In the hearing before the IJ, Berete stated that his father ran a diamond business, their family consorted with high ranking government officials, and his father was a known supporter of Momoh. As the asylum officer pointed out, the claim repeated on the I-589 forms and to the asylum officer would not qualify Berete for asylum because he did not allege that he was a member of a protected category. Connecting his father with government officials represented an attempt to connect his injury with political persecution. We can also then think of the discrepancy between the beating at home with the shooting while fleeing as Berete framing his injury not in the context of a general rebel attack on a place, but a targeted crime on Berete's father for his political affiliations.

No doubt, "[t]he purpose of holding a removal hearing is not simply to reiterate the statements made in the asylum application, but rather to allow an alien to . . . supplement statements made in the application itself with additional details or incidents." *Vasha v. Gonzales*, 410 F.3d 863, 871 n.4 (6th Cir. 2005). But this largely applies to omissions because of the difficulty in providing an exhaustive and detailed list of all incidents of persecution. *Id.* Berete did not merely supplement his claim before the IJ, he contradicted his previous claim in ways that went to the heart of his claim.

The BIA nor the IJ need give specific reasons for rejecting Berete's explanation for the discrepancies, it need only give specific reasons which go to the heart of his claim for not finding Berete credible. The identification of Berete's inconsistencies suffice. Berete would like us to interpret his testimony to mean that he injured his leg when the car rolled over which killed his father at the same time, while other people were beaten outside of his home. The confusion resulted from a layman translator. While Berete's interpretation and explanation are plausible, the IJ's contrary interpretation is not unreasonable–which is how we review the IJ's conclusions. *Shkabari v. Gonzales*, 427 F.3d 324, 330 (6th Cir. 2005). The IJ then identified inconsistencies which went to the heart of Berete's claim. Substantial evidence supports his conclusions.

B.     Due Process

Berete argues that the IJ violated 8 U.S.C. § 1229a which states that "the alien shall have a reasonable opportunity to examine the evidence against the alien." *Id.* § 1229a(b)(4)(B). "[W]e review evidentiary rulings by IJs only to determine whether such rulings have resulted in a violation of due process. *Singh v. Ashcroft*, 398 F.3d 396, 406-07 (6th Cir. 2005). The opportunity to examine the evidence "need not be upon a regular, set occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time be appropriate to the nature of the case upon which such officers are required to act." *Id.* (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998)).

At the hearing, Berete testified that he was injured and his father died in a car accident. For rebuttal purposes, the government asked if it could submit the asylum officer's recommendation and notes. The IJ allowed it, and asked that the government fax him and Berete's counsel a copy to review over lunch. The IJ received it and reviewed it over lunch, but Berete's counsel did not receive it prior to re-convening following lunch. Having been informed of this, the IJ gave Berete's

counsel time to review the memorandum and conduct a direct examination of Berete in which Berete explained that he told the asylum officer that the car rolled over and broke his leg after rebels shot out his tires. He suggested that the layperson translator made the error.

Berete's argument fails because any procedural error he identifies must be more than harmless. *Gilaj v. Gonzales*, 408 F.3d 275, 290 (6th Cir. 2005) (citing *Castellano-Chacon v. INS*, 341 F.3d 533, 553 (6th Cir. 2003)). True, Berete did not have an opportunity to review the produced document prior to the hearing, nor is it clear that Berete was given an opportunity to look through the document with his counsel at the hearing. But the asylum officer's recommendation and notes did not become an issue at trial until Berete testified that he told the asylum officer the same story he told at the hearing that day. The government submitted the produced document as rebuttal. Berete's counsel reviewed the document, asked Berete about it, and he offered an explanation. Therefore, if the IJ committed error, it was harmless because Berete was able to respond adequately to the document such that he was not prejudiced by its admittance.

Also based on 8 U.S.C. § 1229a and due process generally, Berete argues that the IJ inappropriately admitted the unsworn and unauthenticated asylum officer recommendation and notes. However, Berete is unable to show that he was prejudiced by the content of the recommendation and notes. First, while the asylum officer wrote in his recommendation that "Applicant stated that he suffered a broken leg as a result of the beating," he wrote in his notes that "Applicant stated his family tried to escape in a car but the rebels began shooting. Applicant's father was killed." Prejudice is lacking where the asylum officer's notes supported the version of events Berete told to the IJ. Second, and more importantly, the IJ did not rely on the asylum officer's recommendation or notes to determine that Berete was not credible. The IJ made clear in explaining his conclusion that he relied only on the discrepancies between the two I-589 forms and Berete's testimony in front

of the IJ.  That provided the necessary substantial evidence to support his conclusion that Berete lacked credibility, and so if the IJ committed error, it was harmless.

## CONCLUSION

Ultimately, the inconsistencies in Berete's stories doomed his claim.  While his explanations that he was initially advised by a layperson who may not have been the most able translator or legal advisor and his lawyer did not consult him in the preparation of the second I-589 form taken together are plausible, they do not compel a contrary decision.  The IJ's decision is supported by substantial evidence and is not tainted by procedural error.  The petition is denied.